[Civ. No. 5180. Fifth Dist. Dec. 30, 1981.]

BANK OF AMERICA, as Co-executor, etc., et al., Plaintiffs and Respondents, v.
COUNTY OF FRESNO, Defendant and Appellant.

COUNSEL

Floyd R. B. Viau, County Counsel, J. Steven Lempel, Chief Deputy County Counsel and Paul Edmond Stephan, Deputy County Counsel, for Defendant and Appellant.

Wild, Carter, Tipton, Quaschnick & Oliver, Wild, Carter, Tipton & Oliver and Trevor C. Clegg for Plaintiffs and Respondents.

OPINION

FRANSON, Acting P. J.—

STATEMENT OF THE CASE

This is an appeal from a judgment of the superior court ordering a remand of respondent's claim for refund of real property taxes to the Fresno County Board of Supervisors sitting as a board of equalization. The judgment specified certain evidentiary errors committed by the board at the equalization hearing and found that respondent had presented a prima facie case of overassessment.

During the equalization hearing, respondent (referred to herein in the singular) was prevented from presenting certain evidence because of its asserted irrelevancy or because it was not exchanged with the assessor before the hearing. The board ultimately found respondent had failed to present a prima facie case. Respondent's application for a reduction in assessment valuations and claim for refund of taxes paid under protest were denied without the county assessor having to present any evidence of a proper assessment.

Respondent sought relief in the superior court by a complaint for refund of taxes. After reviewing the record of equalization hearing, the court found that respondent should have been permitted to introduce evidence on the following matters:

1. Soil and water conditions underlying the Noble vineyard.

2. Quality of the Noble vineyard and grapes produced therefrom.

3. 1976 crop year production and sales data for the purpose of corroborating the testimony of respondent's witnesses Sarabian and Miles.

4. Assessed values determined by the county assessor with respect to living and nonliving improvements for the purpose of illustrating the manner in which respondent determined the capitalization rate to be applied to income.

5. Whether or not the respondent had available the option of leasing the Noble vineyard during the 1975 crop year.

The trial court then ruled that Revenue and Taxation Code section 1606, which provides for an exchange of information between the taxpayer and the assessor, is "essentially a discovery measure and should be liberally construed." In addition, the court held that a prima facie case of overassessment had been presented. The action was remanded back to the board for further proceedings.

## THE EVIDENCE

The respondents are duly qualified, appointed and acting co-executors of the will of William H. Noble, deceased. Among the assets of the Noble estate are 12 parcels of property comprising some 5,000 acres in western Fresno County planted primarily to varietal grapes. Each of the parcels is contractually restricted to agricultural use pursuant to the California Land Conservation Act, commonly known as the Williamson Act.

Because the final plantings of grapevines on the subject property took place in 1972, the assessor did not have an opportunity to assess the property as fully improved with the vines until the lien date in 1976.[1] This assessment resulted in a 52 percent increase in the assessed value. Respondent paid the increased taxes under protest and filed timely applications for equalization hearings for each of the 12 parcels. The Fresno County Board of Supervisors, acting as a board of equalization

---

[1]Under California Constitution article XIII, section 3, subdivision (i), vineyards cannot be taxed as an improvement until three years after the season in which they were planted.

under section 1601 of the Revenue and Taxation Code, held a hearing on the applications on April 13 and 14, 1977.

Respondent's counsel in opening statement alluded to the income received from the property in question during 1976. Counsel for the appellant promptly objected arguing that no data later than 90 days after the lien date should be considered. The board sustained the objection. Counsel for the respondent attempted to point out that the board was considering capitalization of income rather than fair market value, and further that information as to subsequent earnings was material in determining the long term income expected from the property.

Respondent produced three witnesses at the hearing, Mr. Robert L. Smith, Mr. Sarkis Sarabian and Mr. James Miles. Smith, the co-executor of the estate and manager of the Noble Land and Cattle Company, testified first. He had managed the Noble estate and its predecessor for 20 years.

Smith testified that the 12 parcels in question constituted 5,000 acres of vineyard of which 175 acres were planted to Thompson seedless grapes with the balance planted to varietal wine grapes. Varietal grapes, unlike Thompson seedless grapes, can only be used in wine making; they cannot be sold as table grapes or made into raisins.

Smith further testified that the grapes were sold in a commercially reasonable manner for the highest and best price available, but the Noble estate still suffered a net operating loss of $47.44 per acre. Even if the estate had been able to secure the higher prices quoted by the Federal State Market News Service, it still would have suffered a net loss of $18.94 per acre. Thus, Smith concluded that despite prudent management, the subject property could not have been operated at a profit during the period in question. According to Smith, the market for varietal grapes in 1975 was depressed because of an oversupply. The market for Thompson seedless grapes was better since they had alternative uses.

Smith attempted to testify on the condition of the estate's soil and water. Appellant's counsel objected, arguing that this evidence was never presented to appellant in the exchange under section 1606. The basis of the objection, which was sustained, was that although production figures were provided on the productivity of the Noble estate, there was no textual discussion of productivity or soil and water conditions.

Smith also attempted to estimate the rental value of the subject property. A lengthy debate ensued. Eventually, Smith did testify that the rental value of open land with pipelines was $75 per acre.

Respondent's second witness was Mr. Sarkis Sarabian, a highly qualified agricultural consultant. He confirmed Smith's testimony that the production costs on the subject property were reasonable and that the highest and best prices available were obtained.

Sarabian testified that the conditions responsible for the losses in 1975 had continued unabated into the next year. He noted that many growers of varietal grapes had suffered problems and that approximately 14,000 acres of such grapes had been pulled and destroyed between the end of the 1975 harvest season and the lien date of 1976. No long term contracts were available for varietal growers in 1975. Because of their alternative uses, Thompson seedless growers were able to obtain higher prices than varietal growers.

Sarabian attempted to testify on the soil, water and related conditions of the Noble estate along with the quality of the grapes grown. This evidence again was excluded because the board concluded there was nothing presented in the exchange of information relating to such evidence except for a letter identifying Sarabian as a witness who would give testimony on respondent's "vineyard operations including, without limitation, soil and water conditions, viticulture practices, crop yields, [etc.] . . . ." Sarabian also attempted to testify about the possibility of leasing Noble's vineyards during the 1975 year but a relevancy objection was sustained. Sarabian concluded by stating that during the crop year of 1975 the Noble vineyards could not have been operated at a profit.

Respondent's third witness was Mr. James Miles, an agricultural appraiser and consultant. Miles agreed with Smith's and Sarabian's testimony that the Noble estate had received the best prices possible for its grapes. He discussed the depressed condition of the varietal grape industry which was caused by substantial overplanting in 1972 and 1973.

Miles also testified concerning comparable *leases* and comparable *sales* utilized by the assessor in determining the value of the subject property. His conclusion was that the use of this data was inappropriate. He noted that most of the *leased* land utilized by the assessor as an index of value was open cropland while the remainder was planted sub-

stantially with Thompson seedless rather than varietal grapes. Miles opined that leases of Thompson seedless vineyards were not comparable to leases of varietal vineyards because of the multiple uses of Thompson seedless grapes. He also pointed out that in recent years the price of Thompson seedless had been high due to the demand for raisins.

In addition, Miles disagreed with the type of properties deemed to be comparable *sales* by the assessor. Over 50 percent of the land involved was open cropland while the remainder was planted primarily to Thompson seedless grapes. Out of 1,733 arable acres in the assessor's *sales* computation, only 7 acres were planted in varietal grapes.

Miles, however, admitted there are two steps involved in appraising land subject to the Williamson Act. It is first necessary to establish the value of open land without any living improvements and then the value of land with living improvements, i.e., the vines. The capitalized value of the bare land constitutes the minimum value of the land, and it was proper for the assessor to use leases of bare land to establish that minimal value. It was also proper for the assessor to use the leases and sales data on Thompson ranches and bare land to establish a rate of return attributable to nonliving improvements such as pumps, wells, wire, grapestakes, etc. Miles did not know how the assessor used the lease and sale information in assessing the Noble properties.

There was a second round of testimony from Smith. Counsel for the appellant then argued that respondent had failed to present a prima facie case because there had only been testimony on a single year's profit and loss, which was insignificant evidence of an income stream over time, and further that respondent had not presented an independent capitalization rate. A debate ensued between opposing counsel with the board ultimately concluding that for those two reasons a prima facie case had not been presented.

### The Exchange of Information Under Revenue and Taxation Code Section 1606 and Other Evidentiary Rulings

At the time of the equalization hearing, Revenue and Taxation Code section 1606, subdivision (a) provided in pertinent part: "(a) At the time of filing the application or at any time prior to 20 days before the commencement of the hearing on the application, any applicant for a change of an assessment on the local roll or the assessor, in those cases

where the assessed value of the property involved, as shown on the current assessment roll exceeds twenty-five thousand dollars ($25,000) [now $100,000] without regard to any exemptions, may cause an exchange of information between himself and the other party by submitting the following data to the other party in writing:

"(1) Information stating the basis of such party's opinion of value.

"· · · · · · · · · · · · · · ·

"(3) When the opinion of value is to be supported with evidence based on an income study, information relating to income, expenses and the capitalization method."

Section 1606, subdivision (b) limits the scope of the evidence that may be introduced at the hearing: "Whenever information has been exchanged pursuant to this section the parties may not introduce evidence on matters not so exchanged unless the other party consents to such introduction. However, at the hearing, each party may introduce new material relating to the information received from the other party. If a party introduces new material at the hearing, the other party, upon his request, shall be granted a continuance for a reasonable period of time."

The record shows that two items of evidence were excluded on the basis that they had not been exchanged with the assessor prior to the hearing. The excluded evidence pertained to the soil and water conditions of the Noble vineyards and the quality of the vines and grapes produced therefrom. Appellant convinced the board that since respondent had not exchanged any information directly relating to the evidence sought to be introduced, Revenue and Taxation Code section 1606, subdivision (b) barred the admission of such evidence.

Prior to the hearing before the board, respondent initiated discovery pursuant to section 1606. Respondent submitted to the assessor detailed documentation relating to production and expenses and also submitted a resume of the testimony they intended to present to the board through their witness Sarkis Sarabian. The assessor was informed that Sarabian would: "give testimony with respect to all phases of applicant's vineyard operations including, without limitation, *soil and water conditions*, viticulture practices, *crop yields*, revenues, pre-harvest and harvest expenses, market conditions for varietal grapes in 1975, and expected market conditions as of March 1, 1976, and the extent to which there

was generally available from wineries in 1975 long-term marketing contracts covering varietal grapes." (Italics added.) Respondent further advised the assessor that the vineyard's poor yield history had been caused by "inferior water and soil conditions which have simply not been properly evaluated." Respondent invited the assessor to solicit further information stating: "We wish to be as cooperative as possible in assisting your office in analyzing the documents which we have submitted. Accordingly, if you feel that any explanations would be of assistance or you believe that additional data would be helpful to further support applicant's conclusions as to restricted values, please contact either the undersigned or applicant's representative, Robert L. Smith."

In spite of the foregoing, appellant's counsel objected when Smith and Sarabian attempted to testify on the soil and water conditions of the subject property. The theory of appellant's counsel was that to present testimony on these subjects, respondent had to submit a detailed analysis of any studies made by respondent's witnesses on the soil and water conditions. In other words, unless the taxpayer who initiates an exchange gives the assessor all the information in the taxpayer's possession directly relating to the evidence sought to be introduced at the hearing, the statute bars introduction of any testimony on the subject. We believe appellant's interpretation of the meaning of section 1606 is unduly restrictive and violates the legislative purpose behind the statute.

As the assessor argued in *Henderson* v. *Bettis* (1975) 53 Cal.App.3d 486 at page 492 [126 Cal.Rptr. 199], the equalization process is a true adversary proceeding and Revenue and Taxation Code section 1606 is a *discovery* device created by the Legislature to promote a fair and effective equalization process and to take the "game" and element of surprise out of the proceedings. (See *Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 376 [15 Cal.Rptr. 90, 364 P.2d 266].)

The two statutes allowing a form of discovery in real property assessment disputes are Revenue and Taxation Code section 408 and the section in question, 1606. (These sections are discussed in *Henderson* v. *Bettis, supra*, 53 Cal.App.3d 486.) Section 408[2] is used by the taxpay-

---

[2]Section 408 reads: "(a) Except as otherwise provided in subdivisions (b) and (c) any information and records in the assessor's office which are not required by law to be kept or prepared by the assessor, and homeowners' exemption claims, are not public documents and shall not be open to public inspection. Property receiving the homeowners' exemption shall be clearly identified on the assessment roll. The assessor shall

ers to obtain any information the assessor has relating to the appraisal and assessment of taxpayers' property so long as it does not relate to the property or business affairs of another. This *is not an exchange* of information since the assessor cannot compel the taxpayer to disclose his market data unless the assessed value exceeds $25,000 (today $100,000)[3] thereby triggering section 1606. The assessor, however, only must disclose data relating to comparable sales (*id.*, at p. 493).

The scope of required disclosure is much broader under section 1606, but use of the statute triggers a *mutual exchange* of information. Either party may obtain from the other information stating the basis of the party's opinion of value. Disclosure includes, if pertinent, income or replacement costs in addition to comparable sales. The taxpayer has the option of invoking either section 408 or section 1606 while the assessor

---

maintain records which shall be open to public inspection to identify those claimants who have been granted the homeowners' exemption.

"(b) The assessor may provide any appraisal data in his possession to the assessor of any county and shall provide any market data in his possession to an assessor of property or his designated representative upon request. The assessor shall permit an assessee of property or his designated representative to inspect at the assessor's office any information and records, whether or not required to be kept or prepared by the assessor, relating to the appraisal and the assessment of his property. Except as provided in Section 408.1, an assessee or his designated representative, however, shall not be provided or permitted to inspect information and records, other than market data, which also relate to the property or business affairs of another person, unless such disclosure is ordered by a competent court in a proceeding initiated by a taxpayer seeking to challenge the legality of his assessment.

"(c) The assessor shall disclose information, furnish abstracts or permit access to all records in his office to law enforcement agencies, the county grand jury, the board of supervisors or their duly authorized agents, employees or representatives when conducting an investigation of the assessor's office pursuant to Section 25303 of the Government Code, the State Controller, inheritance tax referees, the State Board of Equalization and other duly authorized legislative or administrative bodies of the state pursuant to their authorization to examine such records.

"(d) For purposes of this section, 'market data' means any information in the assessor's possession, whether or not required to be prepared or kept by him, relating to the sale of any property comparable to the property of the assessee, if the assessor bases his assessment of the assessee's property, in whole or in part, on such comparable sale or sales. The assessor shall provide the names of the seller and buyer of each property on which the comparison is based, the location of such property, the date of the sale, and the consideration paid for the property, whether paid in money or otherwise, but for purposes of providing such market data, the assessor shall not display any document relating to the business affairs or property of another."

[3]The threshold amount required before the assessor may invoke section 1606 was raised from $25,000 to $100,000 in the same bill which required property to be assessed at full value beginning the 1981-1982 fiscal year instead of at 25 percent of value. Thus, the increase merely maintained the status quo. (See Stats. 1978, ch. 1207, §§ 1, 2, 9, 20, p. 3872-3873, 3877, 3888-3889; Leg. Counsel's Dig. of Sen. Bill No. 1656, 4 Stats. 1978 (Reg. Sess.) Summary Dig., p. 334.)

cannot use section 408 and can only invoke section 1606 if the assessed value exceeds $25,000. (*Ibid.*) As pointed out by the *Henderson* court, this protaxpayer statutory scheme is equitable since the assessor enjoys a superior advantage. The law presumes assessments are correct, and board of equalization decisions which adopt the assessor's position are protected by the substantial evidence rule. (*Id.*, at pp. 494-495; *West-lake Farms, Inc.* v. *County of Kings* (1974) 39 Cal.App.3d 179, 183, 186-187 [114 Cal.Rptr. 317].)

Accepting appellant's argument that section 1606 requires a very detailed exchange of information flies in the face of the protaxpayer intent expressed by the Legislature in setting up the above statutory scheme. The scheme starts out protaxpayer since the assessor cannot receive *any* information from the taxpayer unless the assessment exceeds $25,000. It is unreasonable to conclude that this statutory scheme starts out as protaxpayer and ends by requiring the taxpayer to set forth in minute detail the evidence that he intends to present at the hearing. Such a requirement would also eliminate much of the need to hold an evidentiary hearing.

Importantly, the equalization "hearing need not be conducted according to technical rules relating to evidence and witnesses." (Rev. & Tax. Code, § 1609; see 51 Cal.Jur.3d, Property Taxes, § 115, p. 239.) "[The board] may admit and act on any evidence that has a direct bearing on the question before it or *tends* to prove the fact in issue." (51 Cal.Jur. 3d, Property Taxes, § 115, p. 239, italics added.) ▮ We should give a reasonable and common sense interpretation to section 1606. If the exchange of information provides reasonable notice to the opposition concerning the subject matter to be presented at the hearing through the testimony of witnesses and evidence, the statute has been complied with. The purpose of the exchange of information has been satisfied. We perceive no requirement that the details of the evidence to be introduced must be exchanged. In the present case, the assessor was advised that respondent would offer evidence as to the poor water and soil conditions of the property. Thus, the assessor had no basis for objecting to the proffered testimony of Smith and Sarabian on this subject.[4]

---

[4]Inasmuch as the assessor presumably is knowledgeable on the soil and water conditions on the west side of Fresno County where the Noble property is located, the fact that the soil was saline and alkaline and had a weed and hardpan problem would come as no surprise to the assessor.

The evidence supporting the right to present the excluded testimony on the quality of the Noble vineyard and grapes is more tenuous. Nevertheless, the trial court did not abuse its discretion in ruling such testimony admissible. Although the assessor was not expressly notified that respondent's witnesses would testify to the vine and grape quality, the assessor was notified there would be testimony on the subject of "crop yields" for the 1975 season. If respondent's witnesses could testify as to the poor production in 1975, they could offer their opinion on the reasons for the poor production, i.e., whether caused by insects, the poor quality of the vines, etc. Thus, the board erred in excluding the evidence.

■ Nor can we find the trial court erred in ruling that respondent should have been able to present evidence concerning the 1976 crop year production and sales revenue to corroborate the testimony of Sarabian and Miles. The evidence was excluded on the ground of irrelevancy, i.e., that no data later than 90 days after the lien date should be considered in arriving at the value of the property on the lien date. (See Rev. & Tax. Code, § 402.5.) However, a rule which is restricted to fair market value assessments should not apply to a capitalization income situation. "Relevant evidence" means evidence upon which responsible persons are accustomed to rely in the conduct of serious affairs; i.e., any evidence having any tendency in reason to prove or disprove any disputed fact that is of consequence to the action, including evidence relevant to the credibility of a witness. (Evid. Code, § 210; Rev. & Tax. Code, § 1609.) In hindsight, the 1976 production returns would have some bearing on the income *potential* of the property as of March 1, 1976, and would tend to corroborate the testimony of Smith and Sarabian concerning the poor quality of the soil, water and vines.

■ The trial court's finding that respondent should have been permitted to introduce evidence of the assessor's values "with respect to living and nonliving improvements for the purpose of illustrating the manner in which plaintiff determined the capitalization rate to be applied to income" (finding 10(c)) is, however, another matter. As noted by appellant, the finding is unintelligible. If it relates to Smith's attempt to utilize the assessor's opinion of the rental value of bare unimproved land to establish a ratio of value between living and nonliving improvements, the board properly excluded the evidence. The assessor's opinion of the rental value of other land was not in evidence since the assessor had not yet commenced its case in chief. At the beginning of the hearing both sides stipulated that $75 per acre was the

proper annual rental value of the bare unimproved land. However, the stipulation was vacated because respondent's counsel apparently misunderstood the stipulation when he sought to show that a portion of the $75 rent was applicable to nonliving improvements such as pumps, pipelines, wires, etc. Respondent, however, persisted in attempting to use the $75 per acre rental figure although there was no evidence in the record establishing it. Respondent's purpose was to show that 88 percent of the rental value of land *with* nonliving improvements is attributable to the land and 12 percent is attributable to the nonliving improvements. The 88 percent and 12 percent figures were derived by breaking down the *assessor's opinion* of the value of the bare land and the value of improvements enrolled for a different unrelated parcel.[5]

The board properly sustained the assessor's objection to the evidence on the grounds of improper foundation, relevancy, and presentation of an impermissible method of valuing restricted open space land. With this exception, we conclude that the board should have received respondent's offered evidence.[6]

### *Respondent Failed to Prove a Prima Facie Case of Overassessment Even With the Aid of the Excluded Evidence*

The pivotal issue before this court is whether the evidence produced by respondent at the equalization hearing established a prima facie case of value under Revenue and Taxation Code section 423 and State Board of Equalization rule 52.

Since the 12 parcels in question were included in an agricultural preserve pursuant to the Williamson Act and were subject to a binding and enforceable contract with the County of Fresno restricting use to agricultural purposes, the assessment procedures are governed by sections 423 and 429 of the Revenue and Taxation Code, rule 52 of the Board of Equalization Property Tax Rule and Regulations (tit. 18, Cal. Ad-

---

[5]At no time did respondent indicate that the purpose of such evidence was to derive a capitalization rate. Indeed, counsel strongly argued: "... The only purpose of it here is to establish a ratio between land and nonliving improvements, and that's the only purpose for which it's used in the illustration."

[6]The trial court also held that respondent should have been able to submit testimony on whether respondent had available the option of leasing the Noble vineyards during the 1975 crop year. This evidence was initially excluded because the board ruled it was not relevant. However, through inadvertence of appellant's counsel this evidence was later admitted. The question is therefore moot.

min. Code, p. 21), and article XIII, section 3, subdivision (i) of the California Constitution.

Article XIII, section 3, subdivision (i) of the Constitution provides that grapevines, but not the land itself, are exempt from real property taxation until three years after the season in which they are planted. This exemption recognizes that vines are not improvements until they mature since the vines return no income to pay taxes until that time.

Section 423 of the Revenue and Taxation Code provides that when valuing land governed by the Williamson Act, the assessor shall not consider sales data on other lands. An alternate method of valuation, capitalization of income, is required. Section 423, subdivision (a)(1) provides that when sufficient rental information is available, the income shall be the fair rent which can be imputed to the land being valued based upon rent actually received for the land by the owner and upon typical rentals received in the area for similar land in similar use, where the owner pays the property tax.[7] When sufficient rental information is not available, paragraph (2) of subdivision (a) of section 423 provides that the income shall be that which the land being valued reasonably can be expected to yield under prudent management. It was this alternate method of valuation that respondent claimed applied to the parcels of property in question. It should be noted that while rental income from restricted property is to be capitalized for assessment purposes, nonliving improvements are assessed at their fair market value.

During the exemption period for vineyards the income to be capitalized must not be less than what the land would yield if it was planted to other typical crops grown in the area during a typical rotation period. (Rev. & Tax. Code, § 423, subd. (a)(3).) Therefore, when the land is planted with vineyards during the period the vineyards are not producing the land is still taxed as if it was planted with typical annual crops. After the vineyards mature the income must not be less than the yield from the vineyards. (Rev. & Tax. Code, § 429.) The assessor must capitalize the greater of (1) the net income that the land and vineyard would yield under prudent management or (2) the net income that the land should yield over a typical rotation period if planted with typical crops. (Cal. Admin. Code, tit. 18, § 52.)

---

[7]One of the major contentions by respondent at the appeals hearing before the county board of supervisors was that there was inadequate information of comparable rents available from which to conclude that the value of respondent's property was $125 per acre.

In valuing vineyards, the net income attributable to the vines must be estimated first and the net income attributable to the land deducted from it. The remainder is then capitalized into the vine value. The net result, however, is that the income which is attributable to the land is capitalized separately because the amortization component of the capitalization rate is excluded since it only applies to perennials and not bare land. The two value figures are then added together.

The expenses which are deductible in arriving at net income are any ordinary and necessary charges for production and maintenance with the exclusion of depletion, debt retirement, interest on funds and taxes. When the income used is from the operating land being valued or from operating comparable land, amounts shall be excluded from the income to provide a fair return on capital investment and operating assets other than the land, to amortize appreciable property, and to fairly compensate the owner-operator for his operating and management services. (Rev. & Tax. Code, § 423, subd. (a)(3).) Once the income from the restricted land has been determined, a capitalization rate *not* derived from sales data is used; the specific components are described in Revenue and Taxation Code section 423, subdivision (b). The value of the land for assessment purposes shall be the quotient for the income determined as provided by section 423, subdivision (a) divided by the capitalization rate determined as provided in subdivision (b).

Although several California cases have discussed the standard of what constitutes a prima facie case of overassessment under the traditional fair market value method of assessment, the question of what constitutes a prima facie case of overassessment under the restricted use method of capitalized income required by Revenue and Taxation Code section 423 is one of first impression.

In *Griffith* v. *County of Los Angeles* (1968) 267 Cal.App.2d 837 [73 Cal.Rptr. 773], the taxpayer applied for reduction of an assessment by contending that the assessor employed an unduly high ratio in valuing the taxpayer's property under the traditional fair market value method of assessment. The court declared that the taxpayers were under an obligation to show a disparity of the ratio between that applied to the taxpayer's property and that applied to other property generally prevailing in the county. The court then stated: "To sustain his burden the taxpayer must at least make a prima facie showing in this regard. That is, he must introduce *some evidence* of the *assessment inequality* before there is any burden on the assessor. Without this prima facie showing

the assessor is not obliged to go forward with any evidence. He may stand on his presumption that the assessment is fair and equitable." (267 Cal.App.2d at p. 842, italics added.) Subsequent cases have reiterated the standard promulgated in *Griffith* (*Campbell Chain Co.* v. *County of Alameda* (1970) 12 Cal.App.3d 248, 258 [90 Cal.Rptr. 501]; see *Glidden Company* v. *County of Alameda* (1970) 5 Cal.App.3d 371, 383 [85 Cal.Rptr. 88, 86 Cal.Rptr. 464]).

The law presumes the assessor has properly performed his duty and has assessed all properties fairly and upon an equal basis. The effect of this presumption is to impose on the applicant the burden of proving that the property in question has not been correctly assessed. Thus, the law requires the taxpayer "establish the full value of the property by independent evidence." (Rev. & Tax. Code, § 1610.8; Cal. Admin. Code, tit. 18, § 321, subd. (a).) "[I]f the applicant fails to present evidence of *value* of the property, the presumption set forth in section 321(a) applies and the board shall not require the assessor to present his case." (Italics added, Cal. Admin. Code, tit. 18, § 313, subd. (c).)

■ We conclude that a prima facie case of overassessment of restricted open space land under the capitalization of income method requires the taxpayer to offer independent proof of the capitalized income value of the land as defined in Revenue and Taxation Code section 423. This requires evidence of projected annual income and expenses from the property together with a capitalization rate to be used in determining the value of the land. (If the taxpayer wishes to adopt the capitalization rate used by the assessor, he should be able to do so by stipulation or by offering the assessor's records into evidence.)

We turn now to the evidence presented by respondent at the equalization hearing. For the most part respondent's case consisted of showing that 1975 was a bad crop year. Because of tremendous overplanting of varietal grapes in previous years, there was a glut in the market. Respondent suffered a net operating loss of $47 per acre for the crop year 1975 even though the grapes were sold at the best price available. The picture did not change during the 1976 year. The evidence showed that some 14,000 acres of varietal vines were pulled out of production after the 1975 season and before the March 1, 1976, lien date.

Respondent was unable to rent the Noble properties during 1975 because of the large holdings of varietal grapes.

Owners of varietal vineyards were substantially worse off than the owners of Thompson vineyards because the Thompson can be put to several uses in addition to wine making, i.e., raisins and table grapes.

The soil and water conditions at the subject property together with the poor quality of some of the vines caused the below average production. None of the property was listed as "class I" agricultural land.

However, none of respondent's witnesses testified that the glut of grapes on the market in 1975 would continue into the future. Furthermore, the record is remarkably devoid of any testimony concerning the effect of pulling 14,000 acres of varietal grapes out of production in 1975. It can only be assumed that such activity would have a strong impact in the future on the varietal grape market, i.e., that the laws of supply and demand would eventually stabilize the market and produce a reasonable return to respondent on the production of varietal grapes.

Respondent failed to offer any testimony of the "estimated annual net income" of the property over the life of the perennials as required by Revenue and Taxation Code section 423 and rule 52 (Cal. Admin. Code, tit. 18, § 52, p. 23-25). In substance respondent's position before the board was that because they lost money in the production of grapes during 1975 and 1976, they would of necessity continue to lose money in the foreseeable future. In other words, the planting of the vines did not increase the value of the land beyond what it was worth as bare land plus nonliving improvements. While this may be true in the short term, it is unrealistic to believe the situation would not change. In any event, for a prima facie case respondent must present some evidence of projected *future* income and expenses and not just evidence of past losses.

The capitalization of income approach to value is described in State Board of Equalization rule 8(c) (Cal. Admin. Code, tit. 18, § 8, subd. (c)): "The amount to be capitalized is the net return which a reasonably well informed owner and reasonably well informed buyers may anticipate on the lien date that the taxable property existing on that date will yield under prudent management and subject to such legally enforceable restrictions as such persons may foresee as of that date." Rule 8(c) is based on the Supreme Court's landmark decision in *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 564-566 [290 P.2d 544]. "... the value of the property is the sum of anticipated future installments of net income from the property, ...

" . . . . . . . . . . . . . . . .

"The first step in the process is to determine prospective net income and this is done by estimating future gross income and deducting therefrom expected necessary expenses . . . .

" . . . . . . . . . . . . . . . .

"The net earnings to be capitalized, therefore, are not those of the present owner of the property, but those that would be anticipated by a prospective purchaser. 'Anticipated future earning power is the *sole* matter of consequence, since reported earnings are already water under the mill.' . . . it is clear that whatever may be the rationale of the property tax, it is not the profitableness of the property to its present owner." See also *Clayton v. County of Los Angeles* (1972) 26 Cal. App.3d 390, 395 [102 Cal.Rptr. 687], wherein the court held that "economic rent," not actual rental income, is the key to value; *California Portland Cement Co. v. State Bd. of Equalization* (1967) 67 Cal.2d 578, 583 [63 Cal.Rptr. 5, 432 P.2d 700], in which the Supreme Court reiterated that "anticipated income is the basis for an estimate of property value under the capitalized earning ability approach"; and *County of Riverside v. Palm-Ramon Development Co.* (1965) 63 Cal.2d 534 [47 Cal.Rptr. 377, 407 P.2d 289].

Respondent strenuously argues that he presented evidence of overassessment of the Noble vineyards through James Miles who testified that in his opinion the so-called comparable leases and sales utilized by the assessor in determining the value of the subject property were improper, i.e., the sales and leases were in fact not comparable to the subject property. He noted that most of the leased land utilized by the assessor was planted substantially with Thompson seedless grapes rather than varietal. He pointed out that not only could the Thompsons be put to multiple uses, but in recent years their price had been high due to the demand for raisins. Miles' disagreement over the nature of the properties deemed to be comparable sales by the assessor was based on the fact that more than 50 percent of the land involved was open cropland while the remainder was planted primarily with Thompson seedless grapes. Out of 1,733 arable acres in the assessor's sales computation, only 7 acres were planted to varietals.

However, on cross-examination, Miles acknowledged there are two steps involved in appraising land subject to the Williamson Act. It is

first necessary to establish the value of open land without any living improvements and then the value of land with improvements. The capitalized value of the bare land constitutes the minimum value of the land, and it was proper for the assessor to use leases of bare land to establish that minimum value. It was also proper for the assessor to use leases and sales data on Thompson vineyards to establish a rate of return attributable to nonliving improvements such as buildings, pumps, well, pipelines, stakes and wires. Miles nevertheless opined that it would be improper for the assessor to use sales and leases of Thompson vineyards in determining the income potential of a varietal vineyard.

Miles' testimony does not show how the assessor used the comparable sales and lease information in connection with the Noble properties. Nor does Miles' testimony show the assessor used the income from Thompson vineyards to project an income figure for the subject properties to be capitalized.

Although the appellant's counsel offered on three occasions to permit the assessor's records to be received in evidence, counsel for respondent refused the offer.

Respondent failed to present evidence to the board from which a reasonable person could project a future income stream for the subject property. No evidence was presented on the projected price of the varietal grapes five, ten and fifteen years down the road. No testimony concerning projected future expenses was presented. As argued by appellant, it would be impossible for the board of equalization to have established a value for 5,000 acres of vineyard based on the evidence produced by respondent. Respondent's evidence was not supplemented by the information contained in the assessor's exchange of information because respondent refused to introduce the evidence. Respondent's argument that because there was no income to capitalize in 1975 or 1976, no income could ever be expected in the future and therefore the 5,000 acres of producing grape vines had no income value, must be rejected as totally suppositious.

In essence, we hold that to present a prima facie case of overassessment when property is assessed by the capitalization of income method, the taxpayer must present evidence of *projected* future income and expenses. The taxpayer cannot rely solely on evidence of past losses especially when such losses have been short term.

The judgment is reversed.

Andreen, J., and Stone (C. V.), J.,* concurred.

Respondents' petition for a hearing by the Supreme Court was denied March 10, 1982. Mosk, J., Richardson, J., and Reynoso, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.