Filed 10/28/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CHEVRON USA, INC., et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>COUNTY OF KERN,<br><br>Defendant and Appellant. | F066273<br><br>(Super. Ct. No. CV-271688)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. David R. Lampe, Judge.

Clement, Fitzpatrick & Kenworthy, Clayton E. Clement; Cahill, Davis & O'Neill and C. Stephen Davis for Plaintiffs and Appellants.

Arnold & Porter, Steven L. Mayer; Theresa A. Goldner, County Counsel, and Jerri S. Bradley, Deputy County Counsel; Kronick Moskovitz Tiedemann & Girard and Brett L. Price for Defendants and Appellants.

-ooOoo-

This tax refund case concerns supplemental assessments of new construction consisting of the drilling, development and completion of oil and gas wells, and related improvements and facilities, on various oil and gas properties operated by Chevron USA, Inc. (Chevron). In the trial court, Chevron and its parent corporation, Chevron Corp

(Corp), challenged the method by which the Kern County Assessor (assessor) and Kern County Assessment Appeals Board (Board) valued the wells as new construction during three tax years. (Rev. & Tax. Code, § 5140, et seq.)[1] The trial court found that the Board used the wrong valuation method and remanded the matter for the Board to determine the propriety of issuing supplemental assessments on the wells. The trial court further rejected Chevron's assertion that certain wells were exempt from supplemental assessment.

The County of Kern (Kern) appeals, arguing (1) Chevron does not have standing to bring a tax refund action, and (2) the Board did not act arbitrarily, abuse its discretion or violate the law when it approved the valuation method the assessor used. Chevron has cross-appealed, arguing certain wells are exempt from supplemental assessment. While we conclude Chevron has standing to maintain this action, we agree with Kern the Board did not abuse its discretion or act contrary to law when it approved the assessor's valuation method, and reject Chevron's exemption arguments. Accordingly, we reverse in part and affirm in part.

## FACTUAL AND PROCEDURAL BACKGROUND

Chevron operates properties in the McKittrick, North Midway, Kern River, Midway Sunset, Lost Hills and Cymric oilfields (collectively the oilfields) located in Kern County. The oilfields have been in operation since the late 1800s or early 1900s. Accordingly, each field has a long history of exploration, development and production, such that the operation and continued development of the field is reasonably well-known and understood. The oilfields had more than 19,000 active wells as of January 1, 2009.

During the 2006-07, 2007-08, and 2008-09 tax years, Chevron drilled over 1,800 wells on the oilfields. Chevron divided these wells into two categories: "infill wells" and "replacement wells." Chevron defines "infill wells" as wells that increase or improve the

---

[1] All undesignated statutory references are to the Revenue and Taxation Code.

drainage volume and overall well count; they typically "recover new reserves that were not being produced by existing wells." In contrast, Chevron defines "replacement wells" as wells that are intended to continue production by replacing an existing producer without increasing the drainage volume or overall well count; these wells typically "recover reserves that were being produced by a failed well and not new recovery."

Before replacing an existing well, Chevron's engineers perform a workover, in which they decide why the existing well is not performing at the rate it should and determine whether the problem can be corrected. As a last resort, the well is placed on a potential replacement list. Whether a well is replaced depends on the economics; before Chevron drills a new well, it does an economic analysis for the proposed well by completing an Authorization for Expenditure (AFE) form. In most cases, the estimates in the AFEs "hopefully" are pretty close to the actual numbers, with some probable overruns and underruns. Unless the economics are positive, so that Chevron expects to make more money from the well than it costs to drill it, the well will not be drilled.

Before 2006, Kern issued supplemental assessments on new wells at 70 percent of the cost of drilling, exempting 30 percent of the cost as fixtures, and did not issue any supplemental assessments for replacement wells. Beginning in 2006, Kern changed its policy and started issuing supplemental assessments based on the full reported cost of all of the subject wells, both infill and replacement.

Chevron paid the supplemental assessments and filed an application with the Board for refund of taxes for the three tax years. As relevant to this appeal, the dispute before the Board focused on four issues: (1) whether the cost approach to value is the correct method of valuing the new wells; (2) whether the new wells can be classified as new construction subject to supplemental assessment; (3) whether the new wells add value to the properties involved; and (4) whether the assessments constitute double

taxation.[2]  After Chevron and the assessor presented witnesses, including valuation experts, and introduced documentary evidence, the Board determined by written order that: (1) based on the evidence presented, the cost approach the assessor used is a reasonable, appropriate and correct method to value the new wells and the assessor appropriately applied that method in determining their taxable values; (2) the construction of new oil and gas wells constitutes new construction subject to supplemental assessment and the exemptions from supplemental assessment for repair and maintenance, or calamity and misfortune, do not apply; (3) all of the new wells add value to the properties on which they are located; and (4) there is no evidence of double taxation in connection with the new wells.  The Board found in favor of the assessor and against Chevron on all of the principal and material issues involved in the proceeding, that the assessor's position on the issues is supported by the preponderance of the evidence, and that Chevron failed to meet its burden of proof.

Chevron and Corp filed suit in the superior court for a tax refund of the supplemental assessments paid, totaling $3,529,630.79.  Before the superior court, Kern argued that neither Chevron nor Corp had standing to pursue the tax refund action because Chevron did not pay the supplemental assessments and Corp did not participate in the Board proceedings.  After trial, at which testimony was taken on the issue of standing and arguments made, and the exchange of post-trial briefs, the court issued its statement of decision.

---

[2] Chevron also contended a portion of the new wells was exempt from supplemental assessment as fixtures and the assessor was barred from arguing the well's fixtures were part of the appraisal unit by the doctrine of collateral estoppel or res judicata.  Both the Board and the trial court found the fixtures associated with the new wells were not exempt from supplemental assessment and collateral estoppel/res judicata did not apply.  Chevron does not challenge these rulings in its cross-appeal.

4.

The court found that Chevron had standing because it paid the taxes at issue and Corp did not have standing because it neither paid the taxes nor participated in the Board proceedings. The court found the assessor's cost method of valuation was incorrect, the correct method is the income method, and the assessor unlawfully failed to assess only the increase in value of the appraisal unit occasioned by the new construction, instead simply enrolling the cost of construction. Reserving jurisdiction, the court remanded the matter to the Board with instructions to return the assessments to the assessor for a different valuation method and to re-determine the value for supplemental assessment. On the remaining issues, the court (1) reserved the issue of whether the supplemental assessments constitute unlawful double taxation because the issue may be mooted by the application of a proper valuation method; (2) found the replacement wells are new construction and do not constitute normal maintenance and repair; and (3) found the exceptions for misfortune or calamity do not apply.

The County filed a timely notice of appeal; Chevron and Corp filed a timely cross-appeal from the same judgment.

## DISCUSSION

I. Kern's Appeal

A. Standing

We begin with standing. At trial, a finance team leader with Chevron who oversees finance staff responsible for the accounting method for property tax payments, testified that when Chevron receives a property tax bill, the local property tax group creates both an account payable to Kern on behalf of Corp and an intercompany payable/receivable between Corp and Chevron, i.e. a payable from Chevron to Corp and a receivable on Corp's book on Chevron's behalf. Thereafter, an entry is made retiring the account payable and Corp issues a check to Kern for the property taxes. The account payable is retired before the check is issued. Although Corp writes the check for the

5.

property taxes, Chevron pays the taxes. The property tax payment is never reflected on Corp's books; it is only reflected on Chevron's balance sheet and financial statement.

Based on this evidence, the trial court found that while Corp paid the taxes for Chevron, the funds to pay the taxes came from Chevron. The trial court concluded that because Chevron paid the taxes and exhausted its administrative remedies by participating in the administrative proceedings, section 5140 did not preclude it from maintaining the refund action. Kern contends the trial court erred in so finding because a property owner cannot maintain an action for a property tax refund when a third party pays the tax on its behalf even if the owner reimburses the third party for the tax payments.

The Legislature has enacted "a specific statutory refund procedure for taxpayers whose property has been improperly assessed." (*IBM Personal Pension Plan v. City and County of San Francisco* (2005) 131 Cal.App.4th 1291, 1299 (*IBM*).) As explained in *IBM*, "[s]ection 5096 provides for the 'refund of taxes paid before or after delinquency if they were erroneously or illegally collected (subd. (b)), or illegally assessed or levied (subd. (c)).' [Citation.] Section 5097 requires that this refund be based on a claim that is '(1) Verified by the person who paid the tax . . . [¶] If a refund claim filed pursuant to section 5097 is denied, section 5140 authorizes an action for refund of the taxes paid." (*IBM*, *supra*, 131 Cal.App.4th at pp. 1299-1300.) As pertinent here, section 5140 provides: "The person who paid the tax . . . may bring an action only in the superior court against a county . . . to recover a tax which the board of supervisors of the county . . . has refused to refund on a claim filed pursuant to Article 1 (commencing with Section 4096) of this chapter. No other person may bring such an action; but if another should do so, judgment shall not be rendered for the plaintiff."

The issue here is whether Chevron is "[t]he person who paid the tax" within the meaning of section 5140. If so, then Chevron has standing to pursue this action.

6.

Whether Chevron has standing "is a question of law that we review de novo." (*IBM*, *supra*, 131 Cal.App.4th at p. 1299.)

"'"The limitation contained in section 5140 simply means that only a person who has actually paid the tax may bring an action as opposed to the situation where someone else pays the property taxes of an owner of property."' [Citation.] [¶] '[S]ection 5140 . . . merely defines the procedure for refunding taxes improperly collected. The procedure provides for refund to the person who, or entity which, paid the tax if the property was exempt. This orderly approach prevents double refund of the taxes to the party who paid the tax and the party who owns the tax-exempt property. . . . [¶] . . . [S]ection 5140 is a mechanism for enforcing constitutional and statutory rights. Failure to follow the correct procedural rules can result in forfeiture of the power to enforce the constitutional right.' (*Mayhew Tech Center, Phase II v. County of Sacramento* (1992) 4 Cal.App.4th 497, 510 [(*Mayhew*)].)" (*IBM*, *supra*, 131 Cal.App.4th at p. 1301.)

Our Supreme Court has held that section 5140 "operates to benefit 'all persons who pay taxes they are not legally bound to pay' [citation] but does not allow a recovery by a property owner whose taxes have been paid by someone else under a contract to do so. In that case the property owner has parted with nothing and he has no valid claim for a refund." (*Easton v. County of Alameda* (1937) 9 Cal.2d 301, 303 (*Easton*).) In *IBM*, the appellate court held that an IBM pension plan did not have standing to maintain a suit to recover property taxes and fraud penalties paid on its behalf by the plan's trustee, a bank. (*IBM*, *supra*, 131 Cal.App.4th at p. 1294.) There, IBM authorized the trustee to wire money from a particular "'IBM transfer account'" to the Bank of America for payment of property taxes and penalties assessed on the subject property; the record did not reveal whether the funds in the transfer account belonged to the plan or IBM. (*Id.* at p. 1303.) The attorney for the plan and IBM admitted in a pre-litigation letter that the plan could not pursue appeals through the California courts because it was not the taxpayer. (*Ibid.*) Based on these facts, the appellate court concluded the plain language

7.

of section 5140 compelled the conclusion the plan lacked standing to seek the refund of taxes paid because it did not pay them. (*IBM*, *supra*, 131 Cal.App.4th at p. 1304.)

In so holding, the court reviewed other Revenue and Taxation Code sections regarding tax refund actions that contain similar language, and noted the reason these statutes "impose such a restrictive standing requirement is evident. This limitation frees the taxing authority from the burden . . . of untangling a web of agreements and/or accounts in order to ascertain who is the proper recipient of any refund due. This determination is, of course, critical to avoiding a double payment." (*IBM*, *supra*, 131 Cal.App.4th at p. 1305.) The court determined that even though IBM, the trustee and the plan's investment advisor had executed a release and indemnification agreement that gave the plan all rights to recover any overpayment of taxes and penalties, "the standing limitation insulates the taxing authority from the risk of inaccurately determining the agreement's validity." (*IBM*, *supra*, 131 Cal.App.4th at pp. 1296, 1305, fn. omitted.) Finally, the court noted the record did not establish that the plan paid the taxes challenged and did not reflect that the plan authorized the trustee to wire the money in payment of the taxes or that the money was wired from the plan's funds. The court concluded that neither the existence of the indemnity agreement nor the fact the plan may be the real party in interest "permit[ted] a person or entity other than one expressly authorized in section 5140 to bring a tax refund action." (*IBM*, *supra*, 131 Cal.App.4th at p. 1305.)

In contrast to the record in *IBM*, here the record shows the supplemental assessments were paid with Chevron's funds, even though Corp's name appeared on the checks. In effect, Corp was the conduit of Chevron's tax payments. This situation is different than the one in *IBM*, in which the trustee paid the taxes and penalties with money that apparently did not belong to the plan. It is also distinguishable from another case Kern relies on, *Mayhew*, *supra*, 4 Cal.App.4th 497. There, the state and a general partnership entered into lease-purchase agreements that required the state to pay any taxes and assessments levied on the property it was leasing. (*Id.* at pp. 501-502.) After

8.

the county assessed property taxes based on a transfer of title to a corporation, the state, partnership and corporation brought refund actions against the county for property taxes paid for three fiscal years. (*Id.* at pp. 504, 507, 509.) The trial court allowed the state to recover property taxes for the one year the state paid the taxes, but denied recovery for the other years because the state did not pay the taxes for those years. (*Id.*at pp. 503-504.) On appeal, the state argued it was improperly denied a refund for the two years it did not "directly" pay taxes to the county. (*Id.* at 504.) The Court of Appeal rejected the state's refund argument, holding that the state could not obtain a refund for those two years because it did not pay the taxes, commenting that if the partnership paid those taxes and the state reimbursed the partnership through "increased rental payments or otherwise," then the state should retrieve the funds from the partnership. (*Id.* at p. 510.)

Unlike the state in *Mayhew*, Chevron did pay the taxes itself, using Corp as a conduit. It did not, as Kern asserts, reimburse Corp for taxes Corp paid with its own funds. Instead, it gave the money to Corp, who wrote the check to Kern. These facts also distinguish this case from *Grotenhuis v. County of Santa Barbara* (2010) 182 Cal.App.4th 1158 (*Grotenhuis*), in which the appellate court held that an individual "may not sue to recover excess property taxes paid by someone else, such as his landlord, who pays the tax by design or mistake." (*Id.* at p. 1165.) There, a sole shareholder of a closely held corporation sought a refund of taxes paid by the corporation, which held title to the taxed property. Citing *Easton*, *IBM* and *Mayhew*, the Court of Appeal held the shareholder lacked standing to bring such an action based on the plain language of section 5140. (*Grotenhuis*, *supra*, 182 Cal.App.4th at p. 1165.) None of the authorities Kern cites state a property owner will be denied judicial relief where a third person issues a check that pays taxes with the owner's funds.

Kern contends the conclusion that Chevron paid the taxes is contrary to the statute's plain terms. But section 5140 says "[t]he person who paid the tax" may bring the action. Here, although the check has Corp's name on it, the "person who paid the

9.

tax" is Chevron. Kern also asserts this holding violates the principle of strict compliance discussed in *IBM*, which explains that because the State Constitution "vests the Legislature with plenary control over the manner in which tax refunds may be obtained, a party 'must show strict, rather than substantial, compliance with the administrative procedures established by the Legislature.'" (*IBM*, *supra*, 131 Cal.App.4th at p. 1299.) Chevron, however, did strictly comply with section 5140 when it paid the tax using Corp as a conduit. Finally, Kern argues this burdens it with having to determine the proper recipient of a refund in situations such as this and could result in double refund. This case, however, does not involve "untangling a web of agreements and/or accounts in order to ascertain who is the proper recipient of any refund due" as expressed in *IBM*, *supra*, 131 Cal.App.4th at p. 1305). Since the evidence clearly established that Chevron paid the tax via a check with Corp's name on it, there is no danger of a double refund.

In sum, we conclude that Chevron has standing to pursue this refund action.

B.      The Valuation Method

Kern contends the superior court erred in invalidating the assessor's valuation method and ordering the use of an approach based on how much income the new wells added.

1.  Standard of Review

"In reviewing a property tax assessment, the court must presume the assessor properly performed his or her duty and that the assessment was both regularly and correctly made. [Citation.] The burden is on the taxpayer to prove the property was improperly assessed." (*California Minerals, L.P. v. County of Kern* (2007) 152 Cal.App.4th 1016, 1022 (*California Minerals*).)

When the taxpayer claims a valid valuation method was applied improperly, "the court may overturn the assessment appeals board's decision only if there is no substantial evidence in the administrative record to support it." (*California Minerals*, *supra*, 152 Cal.App.4th at p. 1022.) However, if the taxpayer challenges the validity of the

10.

valuation method itself, the court is faced with a question of law subject to our independent review. (*Ibid.*; *Maples v. Kern County Assessment Appeals Bd.* (2002) 103 Cal.App.4th 172, 178 (*Maples*).) "We must determine 'whether the challenged method of valuation is arbitrary, in excess of discretion, or in violation of the standards prescribed by law.'" (*Maples*, *supra*, 103 Cal.App.4th at p. 178.)

"'In this regard we look not to whether another approach might also have been valid or yielded a more precise reflection of the property's value, but whether the method chosen was contrary to law. [Citations.] 'The law requires only that an assessor adopt and use a reasonable method – neither a trial court, not this court, can reject a method found by the board to be reasonable merely because, in [its] nonexpert opinion, another method might have been better.'" (*County of Orange v. Orange County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 524, 530.)

In the present case, we must determine whether the cost approach used to value the new wells, which the Board approved, was arbitrary, an abuse of discretion or in violation of law.

As a threshold matter, we address Kern's contention that Chevron is barred from claiming the assessor used an improper valuation method because Chevron failed to value the new wells using its proposed methodology. Pointing to section 1610.8, which provides in pertinent part that "[t]he applicant for a reduction in an assessment on the local roll shall establish the full value of the property by independent evidence," and *Bank of America v. County of Fresno* (1981) 127 Cal.App.3d 295 (*Bank of America*), Kern asserts that a taxpayer claiming the assessor used an unlawful valuation method must show what the value of its property would be under its proposed valuation methodology. Kern argues that because Chevron made no attempt to value the new wells using the valuation method it claims is appropriate, i.e. the income approach to valuation, it failed to satisfy its burden of proof under section 1610.8.

In *Bank of America*, the taxpayer was claiming a valid valuation method, the capitalization of income method, was applied improperly, resulting in an overassessment of restricted open space land. (*Bank of America*, *supra*, 127 Cal.App.3d at p. 312.) This court held that, to establish a prima facie case of overassessment, the taxpayer was required to offer independent proof of the capitalized income value of the land as defined by statute, which includes evidence of the projected future income and expenses. (*Id.* at pp. 312, 315.) Since the taxpayer in *Bank of America* failed to present such evidence, it did not satisfy its burden of proof. (*Id.* at pp. 315-316.)

In contrast here, Chevron is challenging the validity of the valuation method the Board adopted. In *ITT World Communications, Inc. v. County of Santa Clara* (1980) 101 Cal.App.3d 246, the taxpayer claimed both that the method of valuation the board used was illegal and that the board erroneously applied an intrinsically sound method of valuation. (*Id.* at pp. 252-253, 257.) While the Court of Appeal decided the first issue, finding the method legal, it refused to consider the second because the taxpayer presented no supporting evidence before the board. (*Id.* at p. 257.) The court therefore determined the taxpayer failed to overcome the presumption of correctness of the assessments and the board's decision could not be overturned for lack of support by substantial evidence. (*Ibid.*) As this case is explained in a tax treatise which Kern cites, "[t]he court emphasized that to successfully challenge the application of a valid method (as contrasted with a challenge to the method itself), the appellant has the burden of presenting evidence that the application of the value method would be unfair or inequitable." (2 Flavin, Taxing Cal. Property (4th ed. 2012) (Flavin), Proving the value § 27.11.)

Since Chevron is challenging the valuation method the Board adopted, i.e. the cash method of valuation, on the ground that it is unlawful, rather than the application of that method, we can review the lawfulness of that method even if Chevron failed to produce evidence before the Board regarding what the value of the new wells would be

12.

according to Chevron's proposed valuation method or evidence from which that value could be determined.

2. Appraisal of Oil and Gas Properties

"The right to remove oil and gas from the ground is a property right, taxable as real property. (*Lynch v. State Bd. Of Equalization* (1985) 164 Cal.App.3d 94, 103 [*Lynch*].) Oil and gas themselves are not owned by anyone until removed from the ground. (*Lynch*, at p. 102.)" (*Maples*, *supra*, 103 Cal.App.4th at p. 186, fn. omitted.)

Before the voters adopted California Constitution, article XIII A in 1978 by passing Proposition 13, tax assessors were permitted to reappraise oil and gas fields annually. As oil and gas reserves were discovered and brought into production, fields were reappraised to capture the new value on the tax rolls. (*Maples*, *supra*, 103 Cal.App.4th at p. 187.) Under Proposition 13, however, routine annual reappraisals are not permitted; instead, a "base year value" is established for real property, which may then be increased by no more than two percent annually unless the property is sold or there is new construction. (Cal. Const., art. XIII A, § 2.)[3] "Accordingly, in order to fit the intrinsically unknown value of oil and gas reserves into the requirement for establishment of base year value, without forfeiting the ability to tax such property by freezing the base year value of new or unexplored oil and gas fields at zero, the taxing authorities needed to reconceptualize the value of oil fields for tax purposes." (*Maples*, *supra*, 103 Cal.App.4th at p. 187.)

To establish valuation principles for oil and gas properties, the State Board of Equalization (SBE) adopted Rule 468 (Cal. Code Regs., tit. 18, § 468).[4] (*Lynch*, *supra*,

---

[3] Further references to article XIII A are to the California Constitution.

[4] All undesignated references to rules are to the rules of the State Board of Equalization.

13.

164 Cal.App.3d at p. 109.)[5] Rule 468, subsection (c) states that oil and gas property interests are "unique" and require "the application of specialized appraisal techniques." The uniqueness arises from two aspects of petroleum producing properties: (1) since petroleum is a depleting, nonrenewable resource, "in the absence of new discoveries of oil at the property, the value of the property decreases over time as existing petroleum is extracted"; and (2) since the total amount of petroleum that profitably can be extracted from a particular property can be accurately known only when the field is fully depleted, geological, economic and technological uncertainties interact to affect the value of a petroleum interest over the course of time. (*Maples*, *supra*, 103 Cal.App.4th at p. 192.)

"Subsection (c) of rule 468 (rule 468(c)) reflects SBE's recognition of these dual factors. It requires assessors to determine the market value of 'the property.' Then the assessor must determine the value of the 'mineral interest' portion of the particular appraisal unit in the following manner: After determining "total unit market value" of the property and "the volume of reserves using current market data" (rule 468(c)(4)(A)), the assessor must subtract from the total market value that portion attributable to 'land (other than mineral rights)' and improvements. The remainder is the 'current value of taxable reserves' (rule 468(c)(4)(B).) [¶] The calculated value for the petroleum interest on each appraisal unit is used as the basis both for reducing the value of the interest based on depletion (rule 468(c)(4)(D)) and for increasing the value based on addition of reserves (rule 468(c)(4)(E)) by 'discovery, construction of improvements, or changes in economic conditions' (rule 468 (c)(3)). In this manner, the rule accommodates both the uniqueness of petroleum properties . . . and the requirements of Proposition 13." (*Maples*, *supra*, 103 Cal.App.4th at p. 192.)

---

[5] The SBE is charged by statute with ensuring that taxation is uniform throughout the state. (Gov. Code, § 15606.)

Thus, to determine the base year value of an oil and gas property for purposes of Proposition 13, the market value of the property is divided into two base year values – one comprised of the market value of the land (other than mineral rights) and improvements, and the other of the mineral interest. "[T]he base year value of the *nonpetroleum* interest is fixed in accordance with Proposition 13, but the *petroleum* interest is subject to revaluation based on changes in proved reserves, as defined in rule 468(b) and as calculated pursuant to rule 468(c)." (*Maples*, *supra*, 103 Cal.App.4th at p. 193.)[6] Base year values are "determined using factual market data such as prices and expenses ordinarily considered by knowledgeable and informed persons engaged in the operation, buying and selling of oil, gas and other mineral-producing properties and the production therefrom." (Rule 468(c)(1).) Rule 468 is mandatory and allows no other methods of valuation except those set forth by the rule. (*Maples*, *supra*, 103 Cal.App.4th at p. 193.)

The appraisal unit of an oil and gas property consists of four components: proved reserves; wells, casing and parts thereof; land (other than mineral interests); and improvements. (*Exxon Mobil Corp. v. County of Santa Barbara* (2001) 92 Cal.App.4th 1347, 1355 (*Exxon Mobil*).) The modified capitalization of income approach is the most commonly accepted valuation method of the market value of oil and gas property interests. (*Texaco Producing, Inc. v. County of Kern* (1998) 66 Cal.App.4th 1029, 1035 (*Texaco*).) This involves converting a future income stream into a stated value by

---

[6] Rule 468(b) provides: "The market value of an oil and gas mineral property interest is determined by estimating the value of the volumes of proved reserves. Proved reserves are those reserves which geological and engineering information indicate with reasonable certainty to be recoverable in the future, taking into account reasonably projected physical and economic operating conditions. Present and projected economic conditions shall be determined by reference to all economic factors considered by knowledgeable and informed persons engaged in the operation and buying or selling of such properties, e.g., capitalization rates, product prices and operation expenses."

15.

capitalizing the sum of anticipated future installments of net income, less an allowance for interest and the risk of partial or no receipt of income.  (*Id.* at p. 1037.)  When valuing oil and gas producing property, to arrive at the future net income, the appraiser: (1) estimates proved reserves; (2) determines the expected schedule of future production from those reserves and estimates the future gross income; and (3) subtracts the estimated costs of production.  Finally, the assessor discounts the future net income to reduce it to present value.  The final figure is considered the taxable value of the oil and gas interest. (*Texaco*, *supra*, 66 Cal.App.4th at p. 1037; *Lynch*, *supra*, 164 Cal.App.3d at p. 105.)

3.  New Construction

While the base year value of the nonpetroleum interests is fixed, under Proposition 13 and Rule 468, the base year value is reestablished if there is new construction.  (Art. XIII A, § 1, subd. (a) ["The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property."]; Art. XIII A, § 2, subd. (a) ["The 'full cash value' means the . . . appraised value of real property when . . . newly constructed . . .]; § 110.1 ["(a) . . . 'full cash value' of real property, including possessory interest in real property, means the fair market value as determined pursuant to Section 110 for either of the following: [¶] … [¶] (2) For property which is . . . newly constructed . . . : [¶] … [¶] (B) The date on which new construction is completed, and if uncompleted, on the lien date. [¶] The value determined under subdivision (a) shall be known as the base year value for the property. . . . "].)

When there has been new construction, the assessor is required to "determine the new base year value for the portion of any taxable real property which has been newly constructed.  The base year value of the remainder of the property assessed, which did not undergo new construction, shall not be changed. . . ."  (§ 71.)  Rule 463 (Cal. Code Regs., tit. 18, § 463) addresses the issue of new construction.  It explains that when real property is "newly constructed," "the assessor shall ascertain the full value of such 'newly constructed property' as of the date of completion.  This will establish a new base

16.

year full value for *only* that portion of the property which is newly constructed, whether it is an addition or alteration. The taxable value on the total property shall be determined by adding the full value of new construction to the taxable value of preexisting property reduced to account for the taxable value of property removed during construction. The full value of new construction is only that value resulting from the new construction and does not include value increases not associated with the new construction." (Rule 463(a), italics added.)

Rule 463 is applicable to oil and gas properties. As Rule 468, subsection (a), states, "[w]hether or not physical changes to the system employed in recovering [petroleum and natural gas] qualify as new construction shall be determined by reference to Section 463(a)." Rule 468(c)(1) further provides that the "base year value (market value) of the property shall be estimated as of lien date 1975" or on a subsequent change of ownership, and that "[n]ewly constructed improvements and additions in reserves shall be valued as of the lien date of the year for which the roll is being prepared[,]" while improvements removed from the site are deducted from taxable value. Pursuant to Rule 468(c)(5), the valuation of land (other than mineral reserves) and improvements also includes consideration of new construction: "(A) A base year value (market value) of land (including wells, casing and parts thereof) and improvements shall be estimated as of lien date 1975, the date of new construction after 1975, or the date a change of ownership occurs subsequent to lien date 1975. [¶] (B) The value of land (wells, casing and parts thereof) and improvements shall remain at their factored base year value except as provided in (6) below." Rule 468, subsection (c)(6) provides that "value declines" are recognized "when the market value of the appraisal unit, i.e., land, improvements and reserves, is less than the current taxable value base of the same unit."

The drilling and deepening of wells constitutes new construction. As explained in the California State Board of Equalization Assessors' Handbook (AH), section 566 entitled Assessment of Petroleum Properties (rev. Jan. 1999) (AH 566): "New

17.

construction associated with petroleum properties includes the drilling or deepening of wells, recompletions in new zones, the installation of flow lines, and construction of surface production facilities."  (AH 566, p. 6-6.)

### 4.  Supplemental Assessments

Before 1983, reassessments due to changes in ownership or new construction were not made until the following year, thereby resulting in a delay of from four months to 16 months from the date of the triggering event.  The Legislature found this was "an unwarranted reduction of taxes for some taxpayers with a proportionate and inequitable shift of the tax burden to other taxpayers."  (§ 75; see *Montgomery Ward & Co. v. County of Santa Clara* (1996) 47 Cal.App.4th 1122, 1130 (*Montgomery Ward*).)  Accordingly, in July 1983 it enacted a new "supplemental assessment" rule, to fully implement Article XIII A and "to promote increased equity among taxpayers by enrolling and making adjustments of  taxes resulting from changes in assessed value due to changes in ownership and completion of new construction at the time they occur."  (§ 75, para. 1.)

Under this legislation, the assessor is required to appraise property changing ownership or new construction "at its full cash value . . . on the date the change in ownership occurs or the new construction is completed.  The value so determined shall be the new base year value of the property or the new construction."  (§ 75.10.)  A supplemental assessment is then placed on the supplemental roll representing "the difference between the new base year value and the taxable value on the current roll."  (§ 75.11, subd. (a), (b); *Montgomery Ward*, *supra*, 47 Cal.App.4th at p. 1130.)

"The supplemental assessment provision imposes a new *timing mechanism* for valuation and collection.  It does not alter the tax rate or impose new taxes.  Nor is property taxed which was not taxed in the past.  Rather, property owners are simply paying taxes based on the value closer to the time of a change in ownership or the completion of new construction.  (*Shafer v. State Bd. of Equalization* (1985) 174 Cal.App.3d 423, 427-428.)

From these statutes and rules, it is apparent that new construction is appraised at its full cash value or fair market value as of the date the construction is completed. This value becomes the base year value of the new construction, while the base year value of the remainder of the property remains the same. For purposes of oil and gas properties, the value of new construction, such as oil wells, is added to the base year value of the nonpetroleum interests, i.e. land (other than mineral rights) and improvements. Assuming the wells at issue here are "new construction" within the meaning of section 75.10, they must be valued as of the date of completion and that value added to the base year value of the nonpetroleum interests. The issue in Kern's appeal is whether the Board acted unlawfully or unreasonably when it found the assessor's method of valuation, the cost approach, was an appropriate method for determining the full cash value or fair market value of the new wells.

5. The Cost Approach to Valuation

"There are three generally accepted methods of valuation for property tax purposes: the comparable sales method, the income capitalization method, and the cost method." (*Mission Housing Development Co. v. City and County of San Francisco* (1997) 59 Cal.App.4th 55, 83.) Here, the assessor used, and the Board approved, the cost method for valuing the new wells. The cost approach is generally recognized as the appropriate method for assessing new construction and other property "that has experienced relatively little physical deterioration, is not misplaced, is neither over- nor underimproved, and is not affected by other forms of depreciation or obsolescence." (Rule 6(a) (Cal. Code Regs., tit. 18, § 6).) The Assessors' Handbooks endorse the cost method for valuing new construction.[7] AH section 502, Advanced Appraisal (Dec. 1998)

---

[7] "The State Board of Equalization is authorized to prescribe rules, regulations, and instructions to promote uniform assessment practices. (Gov. Code, § 15606, subds. (c)-(g).) The State Board of Equalization Assessors' Handbooks have 'been relied upon

19.

(AH 502) states that, while no single approach to value should be precluded from consideration, "[t]he cost approach is the most commonly applied approach in the appraisal of new construction." (AH 502, pp. 127, 128.) AH 502 advises that the "[p]roper valuation of new construction means estimating the full value of the qualifying new construction as of the date of completion[,]" and only the portion of the property that is newly constructed receives a new base year value; the base year value of the remaining property remains unchanged. (AH 502, pp. 127, 130.)

Moreover, AH 566 instructs that cost is used as the basis of the appraisal of wells and production equipment on oil and gas properties for the purpose of establishing the base year value of those items. (See AH 566, pp. 7-1 ["Although petroleum properties are valued as a unit, wells, other improvements and equipment must be listed, appraised, and assessed separately from the mineral rights."], 7-2 ["Common practice for the appraisal of the well and production equipment is to tie the value directly to its estimated utility to extract petroleum. A remaining reserve factor is determined by taking the estimate of proved reserves and dividing by the total ultimate recovery. Then multiply this factor by the cost of a new well with the current equipment. As reserves are produced, the value of the equipment will decline in direct proportion."])

Here, an appraiser with the assessor's office, David Hammond, reviewed information reported by Chevron regarding the new wells, including the depth, cost, date of completion and type of well, to determine whether the wells were indeed new wells and whether the costs appeared reasonable. Then, using the cost approach, he valued the wells and generated the supplemental assessments. In doing so, he valued only the well, not the mineral rights. That value was added to the lien-date value of the land, which excludes the mineral rights.

---

by the courts in interpreting valuation questions . . . and have been accorded "great weight" in this regard.'" (*Exxon Mobil, supra,* 92 Cal.App.4th at p. 1353, fn. 2.)

20.

Hammond's normal practice is to make adjustments if it is reported to him that the actual cost to drill the well exceeded the anticipated cost. This has happened in the past with Chevron, where Chevron provided him with evidence that the lower portion of a very expensive well was lost; in that case, Hammond apportioned the cost and assumed the lower part of the well was a dry hole, which Kern does not assess. He did not do any "specific analysis" of the new wells to try to determine whether drilling them enhanced the value of the property evaluated at the lien date; neither did he "specifically" analyze whether drilling new wells increased the value of the property. He just took the cost Chevron reported and enrolled it as a supplemental assessment. Hammond explained he did this because the supplemental assessment is on the well itself, not the property, so he was looking at the well's value, not the property's value.

The use of the cost method here was not unreasonable or a violation of law. Instead, its use was consistent with the statutes and rules. The assessor valued the new wells as of the date of completion; assessed only the value of each well, not the mineral rights; and added the new base year value to the base year value of the nonpetroleum interests. The assessor's experts, who are both appraisers of petroleum properties, testified that, for property tax purposes, the unit of appraisal for oil and gas properties is all of the components necessary to operate the property, including wells, but when appraising new construction, only the newly constructed item is appraised. As expert Joseph Colosi explained, Rule 463 makes clear that the adjustment, either the addition or alteration, is the thing to be valued as of the date of completion; the unit of appraisal for the whole property is not the same as valuing the actual physical new construction.

The assessor's experts also agreed that the cost approach is the appropriate method of valuing the new wells. Colosi explained that when he determines whether to levy a supplemental assessment on a new well, if the well is a "normally completed well," he assumes it contributes to the total property and, if the costs associated with it are typical, he uses cost as the basis for valuing it. This means the supplemental assessment would

21.

be equal to the cost of construction.  However, if it costs significantly more to drill a well than expected, actual cost is not used because, in that case, cost does not equal the value added to the property.

The assessor's other expert, Harold Bertholf, prepared a chart showing the value of a hypothetical oil field with one well, which compared the value of the field the day before a new well is added with the value the day after.  The difference between the two cash flows is the value of the well, which is equal to its cost even if the well adds to the recoverable reserves.  Bertholf explained that while the value added was significantly higher than the well's cost, that value was limited to the well because the additional oil cannot be assessed.  According to Bertholf, in the majority of circumstances involving new wells, the value the new well adds is "significantly more" than its cost; he generally assumes the well adds at least its cost in value to the field.  According to both experts, most California counties supplementally assess new wells at 100 percent of the cost.

Colosi testified about an SBE letter to county assessors (LTA), No. 80-9, which contains "Petroleum Assessment Guidelines."  The letter explains that "[s]ubsurface non-retrievable oil well equipment and the hole in the ground have value as long as the property is capable of producing oil or gas," and are part of the total property value.  The letter further states: "Ordinarily, in a development well, the value of the well (well is defined as the subsurface retrievables and non-retrievables) and related production equipment have a first year value equal to their cost new."  That value declines over time as the reserves decline; the decline, however, is not recognized under Proposition 13.

As the SBE rules and Assessors' Handbooks recognize, value and cost are not necessarily identical.  Rule 463(b)(3) advises that when valuing the physical alteration of any improvement which converts the improvement into the substantial equivalent of a new structure or changes the way the altered portion of the structure is used, only the value, "not necessarily the cost, of the alteration shall be added to the appropriately indexed base year value of the pre-existing structure."  Similarly, AH 566 tells assessors

22.

that "[w]hile drilling new wells . . . will normally constitute 'new construction' as that term is used by SBE Rules 463 and 463.5, such activity may not increase the value of the property for the purposes of levying a supplemental assessment. In other words, a supplemental assessment occasioned by such construction may be zero." (AH 566, p. 6-6.) The assessor's expert explained that a supplemental assessment of a new well would be zero where the hole turned out to be dry and had no other utility. As Kern points out, that possibility does not exist in this case because the assessor excluded from assessment dry holes, and non-productive or inoperable wells, and the Board found there was no evidence that any of the new wells fell into these categories.

Chevron contends the assessor's valuation method is incompatible with Rule 468, which requires the use of the income approach to determine the fair market value of the oil and gas property. Chevron reasons that because the income approach is used to assess the entire property, it necessarily must be used to assess the value of the new wells. AH 502 explains that an appraiser may use the income approach to estimate the value of new construction on income-producing properties, which is done by capitalizing the difference in the subject property's economic rent with and without the new construction; this requires income data and capitalization rates from highly comparable properties. (AH 502, p. 129.)

Chevron's expert, Richard Miller, an appraiser of oil and gas properties, testified it was inappropriate to use cost to determine the value of the new wells because "the cost of the well has nothing to do with the income you expect to generate from the well." While Miller admitted the cost approach is used to allocate the property's fair market value to the wells for purposes of establishing their base year value, he opined that valuation of the replacement wells had to be based on the "income approach" by capitalizing "the difference in the subject property's economic rent with and without the new construction." In the case of an oil field, Miller stated that "you should run a cash flow on the whole field with and without the new construction" to determine value. When

23.

there is a continuous program of drilling replacement wells, there will not be a difference in value with or without one replacement well "because you're continuing to roll forward. Every time you drill one and then re-evaluate, you're moving the queue up of replacement wells, and you continue to have to . . . evaluate those over time."

The assessor's experts, however, testified that even if one used the income approach to value the wells, the result would be the same – the value of the new wells equals the cost to drill them. As Colosi testified, if a cash flow were run on a new well, which would include the mineral rights and the value of the well, it would be difficult to see the contribution of the well versus the mineral rights except on the basis of cost. Colosi further explained that on the lien date, the property's anticipated production and anticipated costs are projected; the anticipated costs include the cost of drilling a new well as a negative. This means the property's value is diminished by the anticipated cost of drilling the well, but the well's value is not included in the property; the only thing included is the production benefits on the revenue side. Once the well is actually constructed, the liability is removed from the property, thereby increasing the property's value. This principle was demonstrated in Bertholf's hypothetical one-well property. Thus, contrary to Chevron's contention, the value of the oil field under Rule 468 is greater after a new well is created than before.

While Miller did not disagree that the value of one well could equal the cost of drilling in a one-well field, he contended this principle did not apply in fields such as Chevron's, where there is a continuous process of drilling replacement wells. According to Miller, in that situation there would not be a difference in value with or without one replacement well, as there would be continuous valuation after each well is drilled. Thus, if replacement wells are drilled in succession, the cost of drilling the wells extends out to the future and reduces the value of the last well to be drilled to zero.

Miller's approach, however, is contrary to the statutes and rules governing supplemental assessments of new construction. These require that new construction be

24.

assessed as of the date of completion and that only the value resulting from the new construction, not unassociated value increases, be enrolled as a supplemental assessment, thereby establishing a new base year value for only that newly constructed portion of the property. (See § 75.10; Rule 463(a).) Because the supplemental assessment occurs on the date of completion, the decrease in anticipated costs that occurs when a new well is constructed cannot be offset by an increase in the anticipated expenses of constructing other wells that have not been completed. As Kern explains, "[t]he legal principle that a supplemental assessment enrolls only the value of new construction, and nothing more, validates the Assessor's approach of valuing only one well at a time." Even Chevron's counsel conceded before the Board that if the "unit of appraisal" for supplemental assessment purposes is a single well, then adding a new well to replace a failed well adds value "because it wasn't there before and it's there now."

Chevron also claims the cost method of valuation is incompatible with Rule 468 because "the sole assessable interest in a California oil and gas property is the right to produce oil and gas, and the value of that interest is determined by the present value of the net revenue stream obtained by producing and selling the minerals." Kern's valuation method, however, does not violate this principle, as "the present value of the net revenue stream obtained by producing and selling the minerals," increases when a new well is added because previously anticipated expenses are no longer subtracted from new revenue.

Nor is Chevron correct that the assessor "treated the wells as assessable new construction without regard to the mineral appraisal unit defined by SBE Rule 468." This contention ignores the fact that the appraisal units for a lien date assessment and a supplemental assessment are different: (1) as Rule 468 commands, on the lien date the appraisal unit is the oil and gas interest as a whole, which is then allocated into petroleum and nonpetroleum interests; but (2) as instructed by Rule 463(a), a supplemental assessment is issued based on only the new construction, not the entire oil field, which

25.

creates a new base year value for the new construction that is added to the lien-date base year value of the nonpetroleum interests.

Chevron recognizes, by implication, that supplemental assessments are incompatible with its view of Rule 468 when it asserts that "[t]raditional construction concepts have little meaning in the context of oil and gas assessments." Rule 468(a), however, expressly references Rule 463 without exempting new wells from the ambit of supplemental assessments. AH 566 similarly recognizes that drilling wells normally constitutes new construction within the meaning of Rule 463. (AH 566, pp. 6-6, 6-8.) While Chevron urges us not to apply Proposition 13 in a way inconsistent with the unique nature of the interests being assessed, citing *Lynch*, *supra*, 164 Cal.App.3d 94, we are not free to ignore the plain language of statutes or to dismiss out-of-hand legislative enactments and administrative interpretations of those statutes. (See *In re Hoddinott* (1996) 12 Cal.4th 992, 1002; *Lynch*, *supra*, 164 Cal.App.3d at p. 114.)

Relying on *Exxon Mobil*, *supra*, 92 Cal.App.4th 1347, Chevron asserts the appellate court there rejected the assessor's position in this case, i.e. that the cost approach is a valid method of valuing the new construction. In *Exxon Mobil*, the Court of Appeal held that (1) Exxon's offshore oil and gas leaseholds, and its newly built onshore oil processing facility, constituted one appraisal unit governed by the valuation methods set forth in Rule 468, and (2) therefore the county invalidly used the cost of reproduction method to assess the onshore oil processing facility as a separate appraisal unit. (*Exxon Mobil*, *supra*, 92 Cal.App.4th at pp. 1349-1350, 1357-1358.) As Kern points out, the case does not involve supplemental assessments and therefore has nothing to say about the value of new construction as it relates to such assessments. (See *McWillams v. City of Long Beach* (2013) 56 Cal.4th 613, 626 ["""It is axiomatic that cases are not authority for propositions not considered.""" ].)

Chevron further asserts that it would be unconstitutional to segregate its oilfields into component parts for individual assessment using the income approach for one

26.

component and the cost approach for the other, as assessed value is solely attributable to proven reserves, not construction. Chevron reasons that because Rule 468 implements Proposition 13 for oil and gas assessment by first valuing additions to and removal from the reserve base, adding taxable value for construction activity is an "end run" around the Proposition 13 cap on assessed value.

But that is not how Rule 468 works. Rule 468 provides that when oil and gas property is first assessed at the 1975 lien date or on a change of ownership, the base year value (market value) of the appraisal unit, i.e. the proved reserves, land (other than mineral interest), and improvements, is determined. Newly constructed improvements and additions to reserves are valued as of the lien date for which the roll is being prepared, and improvements removed from the site are deducted from the taxable value. (Rule 468(c)(1).) Thus, contrary to Chevron's assertion, Rule 468 requires the addition of the value of new construction to the property's base year value.

The total unit market value is then apportioned between (1) the value of the nonpetroleum interests, i.e. the land (other than mineral rights) and improvements, and (2) the taxable value of mineral reserves. This is done by determining the market value of the nonpetroleum interests, which Chevron concedes is done using the cost approach, and subtracting that value from the property's market value. This creates two base year values: (1) a base year value of the nonpetroleum interests that is fixed in accordance with Proposition 13; and (2) a base year value of the petroleum interest that is subject to revaluation based on changes in proved reserves. (*Maples*, *supra*, 103 Cal.App.4th at pp. 192-193.) The base year value of the nonpetroleum interests may be increased no more than two percent per year, but is adjusted when there is a change of ownership or new construction, while the base year value of the mineral reserves is adjusted annually by deducting depletions and adding new reserves. (Rule 468(c)(1), (4) & (5).) Value declines for the entire property are recognized when the market value of the appraisal unit is less than the current taxable value of that unit. (Rule 468(c)(6).)

27.

Rule 468 clearly contemplates the addition of the value of new construction to the base year value of the nonpetroleum interests; therefore, adding the taxable value of new construction is not an "end run" around Proposition 13's cap on assessed value. A supplemental assessment of new construction results in additional value that becomes the base year value of the new construction. (§ 75.10, subd. (a).) This is fully consistent with Rule 468, which states that the base year value of nonpetroleum interests is equal to its market value on the date of new construction. (Rule 468(c)(5).) If the market value of nonpetroleum interests is determined using the cost approach, then using the cost approach to determine the value of new construction that is added to that is in line with Rule 468.

Citing to a LTA No. 87/40,[8] Chevron contends that new construction supplemental assessments are limited to the amount by which the new construction increases the value of the "unit of appraisal." LTA No. 87/40, entitled "Assessment of Dry Hole Wells," addresses the correct assessment procedure when a new oil well is drilled which turns out to be a dry hole. The question was presented whether an assessor erred when he used the cost approach to supplementally assess such a well because he believed he could not use the income approach, which would have reflected the dry hole and no value, because mineral reserves could only be reassessed on the lien date. The SBE found unlawful the practice of assessing a dry well based on the cost of drilling without considering the reserves. The letter explained that "the determination of the

---

[8] In October 2013, Chevron filed a motion requesting we take judicial notice of (1) SBE's Letter to County Assessors dated April 23, 1987 (LTA No. 87/40), available at http://www.boe.ca.gov/proptaxes/pdf/87_40.pdf [as of Oct. 28, 2014]; (2) SBE's Letter to Assessors No. 2003/039, May 29, 2003, "Hierarchy of Property Tax Authorities (LTA No. 2003/039), available at http://www.boe.ca.gov/proptaxes/pdf/lta03039.pdf [as of Oct. 28, 2014]; and (3) legislative history documents which were the subject of Chevron's request for judicial notice filed with the trial court on May 16, 2011. On November 4, 2013, we deferred ruling on the request. Kern has not objected to the request, which we now grant.

value of new construction of a new well requires the appraisal of the total unit, well and mineral reserve, prior to the allocation of value between the newly constructed well and the proved mineral reserve. When there are no future benefits anticipated from a newly drilled well, i.e., no new reserves, no alternative uses, no operating benefits, etc., there is little, if any, value attributable to the new construction." (LTA No. 87/40, p. 2.)[9]

Based on this letter, Chevron asserts that, at least with respect to replacement wells, while restoring production of an increment of reserves by drilling new wells is an operating benefit, "it is not a new or additional operating benefit because such wells merely restore production of oil already being assessed." But the letter's language implies that the value of a new well is not dependent on discovery of new reserves, as Chevron contends. Instead, the new well has value if it produces any future benefit: "new reserves," or "alternative uses," or "operating benefits." Accordingly, if a new well produces "operating benefits," it is valuable and taxable regardless of whether it leads to the discovery of "new", i.e. previously unknown or untaxed, reserves. Moreover, the central point of LTA 87/40 is that dry wells should not be assessed. Kern does not do so.

Chevron also claims the assessor and the Board arbitrarily added the cost of the wells to the lien date value without any analysis of whether value was added to the "unit of appraisal[,]" as Hammond admitted he did not follow AH 566 when preparing the assessments at issue.[10] Hammond, however, said no such thing. Instead, he testified that

---

[9] The letter went on to explain that if a new well discovers a mineral reserve value less than the cost of constructing the well, it will be a challenge for the appraiser to make a reasonable allocation of value between the newly constructed well and the new reserves; the value allocated to the well is subject to supplemental assessment while the new proved reserves will be assessed the following lien date in an existing field or as a supplemental assessment if the new reserves represent a "new discovery." (LTA 87/40, p. 2.)

[10] Chevron's counsel read Hammond the following excerpt from AH 566, p. 6-6: "While drilling new wells, installing flow lines, and constructing surface production facilities will normally constitute 'new construction' as that term is used by SBE

29.

he did not "specifically" review whether "the activity increased the value of the property" before he assessed the new wells. Moreover, Hammond's testimony, when read in context, states that the supplemental assessments Hammond prepared valued only the new wells as opposed to the property as a whole; he earlier testified that, before issuing the assessments, he determined whether the wells were indeed new wells and whether the costs appeared reasonable. Finally, whatever Hammond subjectively believed he was doing, the assessor's experts testified the cost of the new wells accurately represents the difference in value of the field before and after the construction, and the Board found this to be true.

Chevron next asserts the cost method is unlawful because it resulted in unconstitutional double assessment. Chevron claims that because the property's value determined by means of the income approach assumed the existence of, and depended on, the presence of the wells that were added to the assessment roll based on their cost, double assessment resulted when the assessor and Board added that cost to the existing assessed value derived from an income approach. In support, Chevron cites *El Toro Development Co. v. County of Orange* (1955) 45 Cal.2d 586 (*El Toro*), and *Georgia-Pacific Corp. v. County of Butte* (1974) 37 Cal.App.3d 461 (*Georgia-Pacific*). In *El Toro*, our Supreme Court held that appliances in leased rental units could not be separately assessed because their value was included in the rent paid by the lessees and thus, the income the lessor received. (*El Toro*, *supra*, 45 Cal.2d at p. 589.) In *Georgia-Pacific*, the Court of Appeal held the use of the income method of valuation was improper because it included the value of immature timber that was constitutionally exempt from taxation. (*Georgia-Pacific*, *supra*, 37 Cal.App.3d at p. 470.)

---

Rules 463 and 463.5, such activity may not increase the value of the property for the purposes of levying a supplemental assessment. In other words, a supplemental assessment occasioned by such construction may be zero."

30.

These cases are distinguishable because neither involves supplemental assessments levied on new construction. By definition, such property cannot have been included in the previous year's lien date assessment because it did not yet exist for purposes of property taxation. As the assessor's experts explained, while the income approach of valuing the oil and gas properties may forecast the anticipated construction of new wells and the associated expense, it does not include the value of the wells because they do not exist on the lien date. Moreover, here the cost of the new wells was not added to the assessed value derived from an income approach; instead, it was added to the base year value of the nonpetroleum interests, which was determined based on a cost approach. Accordingly, the wells at issue in this case could not have been assessed before construction was completed and assessing the wells upon completion could not constitute double taxation.

Chevron argues the cost approach is wrong because the actual cost of some of the new wells exceeded the projected cost that was included in the cash flow analysis. As Kern points out, while Chevron gives one example of cost overruns, it never presented evidence or otherwise attempted to prove that such overruns are routine or were not cancelled out by overestimates. Since the assessor's valuation is presumed correct (Evidence Code, § 664) and Chevron had the burden of proving otherwise (Rule 321(a), (b) (Cal. Code Regs., tit. 18, § 321)), Chevron had to make this showing before the Board. Without such a showing, we cannot assume the actual costs routinely exceeded projected costs.

Finally, as Kern points out, the application of Chevron's proposed method of valuation would be virtually impossible. Under that method, the assessor would have to compare the value of the relevant oil field at the lien date with its value after each well was completed to determine whether each well added value in some way and, if so, how

31.

much, which Kern asserts would involve individual valuation determination of hundreds, if not thousands, of wells each year.[11] Chevron's counsel admitted before the Board that Chevron's expert had not appraised the whole unit, stating: "No one has done what I think would be a Herculean task. Given the number of wells we have, in order to demonstrate if there were a value added by this process, and in order to demonstrate what that value was, you would have had to have hundreds of cash flows done, because you'd have to do a cash flow after each one of these wells was drilled. And it would have been impossible to do." Chevron's counsel further admitted that "it would have been virtually impossible for either Mr. Miller or Mr. Bertholf to have run a cash flow for each of the wells."

Practical considerations may have an impact on the assessor's choice of valuation method. For example, in *Bret Harte Inn, Inc. v. City & County of San Francisco* (1976) 16 Cal.3d 14, our Supreme Court considered the valuation of "merchandise, equipment and cash located in [a] hotel." (*Id.* at p. 18.) The Court noted that "[s]ince it is impracticable to attribute specific income to the type of property here in question the income method does not easily lend itself to the appraisal here before us. [¶] Out of substantial necessity, then, the assessor in this case resorted to the so-called cost method, under which the assessor subtracts depreciation from a figure reflecting cost." (*Id.* at

---

[11] According to the "2008 Annual Report of the State Oil & Gas Supervisor" issued by the California Department of Conservation, Division of Oil, Gas & Geothermal Resources, statewide in 2006, 2007 and 2008, there were 1,756, 2,507, and 2,909 completed wells respectively. Under Chevron's proposed method, assessors would have to determine how each of these wells affected previously forecast oil production in the relevant oil field. Kern asked us to take judicial notice of this report; on December 27, 2013, we deferred ruling on the request. Chevron has not objected to the request, which we now grant. (Evid. Code, § 452, subd. (c); *Taiheiyo Cement U.S.A., Inc. v. Franchise Tax Bd.* (2012) 204 Cal.App.4th 254, 267 fn. 5 ["Judicial notice may be taken of official acts of the executive department of this state[,]" including reports of administrative agencies.])

p. 24, fn. omitted.)  Similarly, Flavin states that assessors use the cost method to value newly constructed property for supplemental assessment purposes, even where the property is income-producing, for "practical reasons."  (2 Flavin, Proposition 13 impact § 17:30.)  The same "practical reasons" require adoption of the cost method in this case.

Chevron admits on appeal that a "well-by-well approach would be taxing[,]" but claims this is not what the trial court ordered.  The trial court ruled that the correct valuation method was the income method and ordered the assessor to adopt a methodology that reflects the unique characteristics of oil and gas property.  While the court explained this did not necessarily require reevaluation of the entire appraisal unit, it did state the assessor must evaluate whether new wells add supplemental value, such as increased production, extraordinary out of cycle investment, the acquisition of previously unattainable reserves, or new technology, to determine how the well affects the continuing future net income stream from the appraisal unit reduced to present value.  In remanding the matter to the Board, the court directed the Board to determine whether any supplemental assessments are appropriate under these principles.  Chevron asserts the ruling "left open the possibility that a mass appraisal technique could be used or that the value of new wells could be judged year-by-year for each field."

But, as Kern points out, Chevron's "mass appraisal" approach probably would violate section 75.11, subdivision (c), which provides for a "net supplemental assessment" in addition to the individual assessments occasioned by each item of new construction.[12]  Chevron's claim that the trial court's ruling may not require the assessor to undertake individual assessments for each new well is therefore unfounded.

---

[12] Section 75.11, subdivision (c) provides, in pertinent part:  "If there are . . . multiple completions of new construction . . . with respect to the same real property during the same assessment year, then there shall be a new supplemental assessment placed on the supplemental roll, in addition to the assessment pursuant to subdivision (a) or (b)."  (See also, 1 Flavin, Supplemental roll § 12:9 ["If there are . . . multiple

33.

In sum, we conclude that the Board did not act arbitrarily, in excess of its discretion, or contrary to the law when it approved the cost method of valuation the assessor used to issue supplemental assessments on the new wells. In other words, the assessor's use of the cost method was reasonable and we have no choice but to accept the Board's decision.

## II. Chevron's Cross-Appeal

In its cross-appeal, Chevron challenges only the Board's and trial court's rulings with respect to its so-called "replacement wells." Chevron asserts the replacement wells are not subject to supplemental assessment for three "technical" reasons: (1) "the supplemental assessment of replacement wells and their fixtures is not just a change in timing as required by law, but is an assessment of an entirely new class of property"; (2) the replacement wells constitute "repair and maintenance" because they merely maintain production; and (3) "certain wells were lost and replaced as the result of misfortune."

### A. Assessment of a New Class of Property

Chevron first asserts that issuing supplemental assessments on replacement wells taxes an entirely new class of property, namely "well field improvements that are separately valued and then added to the sole assessable interest, the right to take minerals." Chevron complains that instead of allocating a portion of the field value to wells to determine the residual value of minerals, the assessor adds the cost of the wells to the tax roll without any analysis of the purported new value contribution from the wells or regard for whether the wells will add new value in the next lien date appraisal. Chevron contends this is a new tax, not merely a change in assessment timing, and therefore the supplemental assessments of the replacement wells are void.

completion dates for new construction, there must be a new supplemental assessment for each of the multiple occurrences."])

34.

This argument essentially encompasses the same arguments Chevron made in Kern's appeal concerning the appropriate valuation method of the new wells – arguments which we have already rejected. The premise of Chevron's argument, that the assessor added the cost of the wells without any analysis of the purported value of the new construction, is faulty because, as we explained above, it ignores the fact that the appraisal units for lien date assessment and supplemental assessment are different: pursuant to Rule 468, on the lien date the appraisal unit is the oil and gas interest as a whole, while the appraisal unit for supplemental assessments under Rule 463(a) is only the new construction, namely the replacement wells. Moreover, as we have already explained, the assessor's experts testified the new wells add value to the properties with which they are associated. As the Board found, "a potential buyer for the property would pay more for the property with a completed new well than if that buyer took the property without the well and had to incur the expense of drilling it, reflecting value added by New Wells."

B. Repair and Maintenance

Chevron next contends the replacement wells fall under the "normal maintenance and repair" exemption to supplemental assessments contained in Rule 463(b)(4).

As pertinent here, Section 70 defines "new construction" as "[a]ny addition to real property" and "[a]ny alteration of land or of any improvement, including fixtures" that have occurred since the last lien date. (§ 70, subd. (b).) Rule 463 explains these categories of "new construction" as follows: (1) "[a]ny substantial addition to land or improvements, such as adding land fill, retaining walls, curbs, gutters or sewers to land or constructing a new building or swimming pool or changing an existing improvement so as to add . . . to its square footage or to incorporate an additional fixture . . ."; (2) "[a]ny substantial physical alteration of land which constitutes a major rehabilitation of the land or results in a change in the way the property is used[,]" such as site development of rural land to establish a residential subdivision; and (3) "[a]ny physical alteration of any

35.

improvement which converts the improvement or any portion thereof to the substantial equivalent of a new structure or portion thereof or changes the way in which the portion of the structure that had been altered is used."  (Rule 463(b)(1)(2) & (3).)

Rule 463(b)(4) further explains:  "Excluded from alterations that qualify as 'newly constructed' is construction or reconstruction performed for the purpose of normal maintenance and repair, e.g. routine annual preparation of agricultural land or interior or exterior painting, replacement of roof coverings or the addition of aluminum siding to improvements or the replacement of worn machine parts."  The SBE defines "maintenance" as "the action of continuing, carrying on, preserving, or retaining something; it is the work of keeping something in proper condition.  When performed on real property, maintenance is normal when it is regular, standard, and typical.  Normal maintenance will keep a property in condition to perform efficiently the service for which it is used. [¶]  In contrast to an addition, which constitutes an entirely new portion of real property, normal maintenance is the upkeep of existing real property.  Normal maintenance will ensure that a property will experience a typical economic life."  (AH 502, p. 119.)[13]  While the effects of maintenance and repair may be reflected in the property's market value estimate, the property retains its original base year value without any addition for the costs of the maintenance and repair.  (AH 566, p. 6-6.)

---

[13] The SBE further explains in AH 502 that replacements, i.e. "the substitution of an item that is fundamentally of the same type or utility for an item that is exhausted, worn out, or inadequate," that are "made as part of normal maintenance are excluded from the meaning of new construction."  (AH 502, p. 119.)  Examples of such items include re-plumbing corroded galvanized steel pipe with copper pipe, replacing a heating unit,  repainting worn areas, and replacing bathroom fixtures, roofs, kitchen appliances, wood frame windows or wall or floor coverings.  However, when replacements are so extensive as to make a building or fixture substantially equivalent to new, such as stripping an old house to its studs and rebuilding it from the foundation up, the work is considered new construction.  (AH 502, p. 119.)

Chevron contends the wells it has drilled "to maintain or continue existing production" constitute "normal repair and maintenance." The Board, however, rejected this claim, finding that, as Colosi testified, "the drilling of an entirely new well . . . is not the equivalent of normal repairs and maintenance." The Board explained the evidence showed Chevron "made no effort to replace or repair any portion of a pre-existing well, which might constitute normal repairs and maintenance. The replacement of casing or repairing of rods, tubing, pumps, or motors, or other portions of the well might be considered repairs and maintenance, if not all done at once. The construction of an entirely new well does not constitute repairs and maintenance."[14] Chevron does not challenge these factual findings or contend they are unsupported by substantial evidence.

The Board further found the evidence reflected the new wells are "brand new wells, and do not constitute the reconstruction or repair [of] any existing wells." Noting that pursuant to AH 566, Section 70 and Rule 463(b)(1)(3) & (5), extensive replacements which convert an improvement or fixture to the substantial equivalent of a new structure are assessable new construction, the Board explained that the construction and completion of a new well is not only the substantial equivalent of a new structure, improvement or fixtures, "it is a new structure with new improvements and fixtures." The Board found persuasive that portion of AH 566 which states that when an "original well fails due to pressure decline, loss of permeability, or any reason other than calamity, any replacement well is 'new construction' and is subject to supplemental assessment upon completion." (AH 566, p. 6-8.)

We agree with the Board's findings for the simple reason the replacement wells are not alterations to existing improvements that can be considered repairs or maintenance; instead, they are entirely new wells. Chevron's employees who testified

---

[14] The trial court likewise found that "[t]he construction and completion of an entirely new well does not constitute 'normal maintenance and repair.'"

concerning the operation of the fields at issue explained that replacement wells are drilled to replace a producing well and are drilled in the proximity of the existing well; the replacements are entirely new wells. The exception for repairs and maintenance applies when changes are made to an existing improvement, as shown by examples above. Here, no changes were made to the existing wells; instead, an entirely new well was drilled. Even if the replacement wells are a "regular, standard, typical" well-field practice, as Chevron asserts, they do not qualify as repair or maintenance because they are new structures.

Chevron claims the wells are maintenance because wells are to an oil field as plumbing is to a building; therefore, Chevron reasons, replacing the wells is akin to replacing plumbing, which is clearly maintenance. We agree with the Board's finding on this issue, namely that the contention "stretches the definition of normal repairs and maintenance well beyond its reasonable meaning." In addition, as we have already concluded, this argument ignores the regulations defining the appraisal unit subject to supplemental assessment as the new construction, not the property as a whole.

The Board further found that not all of the new wells were replacements because in many cases wells were drilled to not only replace a well that was damaged or incapable of efficient production, but also to substantially enhance the property's economics and to reach and develop additional zones or producing horizons. Chevron contends this finding is overbroad, incomplete and unsupported by substantial evidence. We need not decide this issue however, because regardless of whether Chevron's replacement wells access new reserves, the wells do not constitute repairs or maintenance.

C. Calamity and Misfortune

Section 70, subdivision (c), also provides an exemption for new construction undertaken to restore property damaged as a result of misfortune or calamity: if "real property has been damaged or destroyed by misfortune or calamity," the timely reconstruction of the property that is substantially equivalent to the property before the

damage or destruction is not included within the meaning of "newly constructed" or "new construction."

Chevron contends it is undisputed that a number of wells in the Lost Hills and Cymric oil fields were (1) damaged by subsurface land movement that sheared or distorted the well bores and casings, or were otherwise suddenly damaged, and (2) damaged beyond repair as a result of maintenance activity that went awry. Chevron asserts these wells were lost due to misfortune or calamity as those terms are used in section 70, and therefore they are not assessable new construction.

The Board found this contention unsupported by the law or the facts in the case. Specifically, it found that pursuant to an opinion by the California Attorney General, 63 Ops. Cal. Atty. Gen. 304 (1980), a disaster declaration from the Governor is required before the exemption for calamity and misfortune applies and no evidence was presented of such a declaration. The Board alternatively found, citing *T.L. Enterprises, Inc. v. County of Los Angeles* (1989) 215 Cal.App.3d 876 (*T.L. Enterprises*), that the wells at issue were not lost due to misfortune or calamity because Chevron anticipates the loss of wells on its properties due to physical and operating circumstances that existed on the properties for many years; it actually budgets for those losses annually with a "relatively good idea as to the number of wells they might lose each year"; the losses result from natural forces over a period of time; and, to some extent, the losses were not beyond Chevron's control as they were caused by Chevron's operating practices, which created subsidence and the loss of wells. The Board determined there was no basis to exclude them from assessment because the loss of wells was not sudden or unexpected, could be provided for and was not beyond Chevron's control.[15]

---

[15] Similarly, the trial court found: "Chevron could and did reasonably anticipate the loss of wells on each and all of its properties due to the physical and operating circumstances extant on such properties for a period of many years. The losses were all the result of natural forces over a period of time. For property tax purposes, property

Chevron argues the Board erred because (1) section 70, subdivision (c), does not state that a disaster declaration from the Governor is required to qualify for the calamity/misfortune exemption, (2) there is insufficient evidence to support the Board's finding that Chevron controlled the conditions that caused the losses, and (3) the Board failed to address the wells lost during maintenance.

We need not decide whether a disaster declaration is required from the Governor because we conclude that, even if no declaration is required, Chevron has failed to show that the wells were lost due to misfortune or calamity within the meaning of section 70, subdivision (c). [16]

In *T.L. Enterprises, supra,* 215 Cal.App.3d 876, 877-879, the owner of an office building sought a refund of property taxes under section 170 due to damage to the building from differential expansion and settling of the underlying bedrock and fill that occurred over an eight-year period. The appellate court affirmed denial of the owner's claim because the damage was not the result of "misfortune or calamity" within the meaning of sections 51, subdivision (d) and 170.[17] (*Id.* at p. 881.) The court noted the

---

damaged or destroyed by calamity or misfortune must be due to an extraordinarily grave event marked by great loss and lasting distress and affliction by an event that is out of the ordinary, unforeseeable and beyond the control of the taxpayer."

[16] In light of our decision not to address the constitutional issues raised concerning whether a Governor-issued disaster declaration is required to claim exemption from supplemental assessment for calamity or misfortune, we deny as irrelevant both Chevron's March 3, 2014 request and Kern's March 17, 2014 request that we take judicial notice of legislative history materials concerning Proposition 13, which we deferred ruling on by our March 18, 2014 order.

[17] Section 170, subdivision (a) authorizes a county board of supervisors to enact an ordinance providing that a person whose "property was damaged or destroyed without his or her fault, may apply for reassessment of that property. . . . .[¶] To be eligible for reassessment the damage or destruction to the property shall have been caused by any of the following: [¶] (1) A major misfortune or calamity, in an area or region subsequently proclaimed by the Governor to be in a state of disaster. . . . [¶] (2) A misfortune or calamity. [¶] (3) A misfortune or calamity that . . . includes a drought condition such as

objective of these statutes "is to afford financial relief to the owners of property physically damaged or destroyed by an unforeseeable occurrence beyond their control." (*Id.* at p. 880.) After reviewing dictionary definitions and portions of the legislative history, the court held that "misfortune or calamity" require an "event out of the ordinary" and "an unusual incident, not a gradually deteriorating condition." (*Id.* at pp. 880-881.)

In so holding, the court looked to a federal case, *Matheson v. Commissioner of Internal Revenue* (2d Cir. 1931) 54 F.2d 537, 539, in which damage to inadequately sheathed pilings was found not to arise from casualty under federal tax law because "'a "casualty" . . . is an event due to some sudden, unexpected, or unusual cause. Anything less than this renders it hardly distinguishable from depreciation from ordinary wear and tear which cannot be deducted by a taxpayer in the case of property that is not used in trade or business.'" (*T.L. Enterprises*, *supra*, 215 Cal.App.3d at p. 881.) The Court of Appeal noted that casualty is defined as "'an unfortunate occurrence' or 'disaster,'" and explained that while "'disaster, misfortune or calamity' may include events not deemed a 'fire, storm, shipwreck or other casualty' [citation], in the present circumstances the reasoning of *Matheson v. Commissioner of Internal Revenue* holds true. The loss to appellant's building was due not to 'disaster, misfortune or calamity,' as required by section 51, subdivision (d), but rather to 'the ordinary action of the elements upon a poorly constructed building.'" (*T.L. Enterprises*, *supra*, 215 Cal.App.3d at p. 881.)

Chevron's petroleum engineers testified that wells in the Lost Hills field can fail when casings snap due to earth movement that occurs when Chevron stops pulling out

existed in this state in 1976 and 1977." Section 51, former subdivision (d), provided in relevant part that "[i]f the property was damaged or destroyed by disaster, misfortune or calamity and the board of supervisors in the county in which the property is located has adopted an ordinance pursuant to Section 170, its assessed value is computed pursuant to Section 170."

41.

fluid.  The earth movement can occur either overnight or over a period of time.  Lost Hills has more subsidence or reservoir movement than other fields, which is the main reason for well failures in that field.  Chevron budgets for those well losses, although it does not know specifically which wells will fail.

The predominate mechanism of well failure in the Cymric field is mechanical failure, due to broken well casings, which is caused by the bending action of the ground movement that creates shear force on the casings.  These are sudden events that can happen overnight.  The average life-to-failure of wells in the Cymric field is approximately seven years; Chevron attributes the short life to mechanical failure due to the shear forces placed on the well.  Chevron knows that earth movement affects the wellbores and casings and that, at some point, that movement will cumulatively reach a point where the casing breaks.  Chevron plans for these well failures by budgeting for replacement wells each year.  Chevron's engineers also testified that wells sometimes fail due to a "fish in the hole," which occurs when something gets stuck in the well that one tries to "fish out of the hole" if possible.

In its opening brief, Chevron argues only that the evidence shows the well losses resulting from geological shifts or maintenance mishaps are sudden, and that the Board's finding it could control the well losses is unsupported by the evidence.  But even if the well failures were sudden and Chevron had no control over them, the evidence cited above shows that the earth movements that caused the wells to fail were not unusual or out-of-the-ordinary events.  As the court in *T.L. Enterprises* stated in rejecting the building owner's contention that the damage to its building caused by earth movement was not a disaster, calamity or misfortune, "[a]ppellant has not shown that its loss was caused by [an out of the ordinary] occurrence.  Although appellant undoubtedly considers the decrease in value a misfortune, it was the result of ordinary natural forces.  Because it took place over a period of years appellant was not in the position of a victim of

42.

earthquake, flood, or fire: it could take steps to alleviate the consequences." (*T.L. Enterprises*, *supra*, 215 Cal.App.3d at p. 880.) The same is true here.

In its reply brief, Chevron asserts that because AH 566 provides at page 6-8 that "[i]n the case of a calamity, a replacement well drilled to recover the same petroleum as the original well would have recovered is not 'new construction'[,]" it implies that casing ruptures and fishes in the hole are calamities. We fail to see the implication. As AH 566 explains at page 6-7, a "replacement well" can refer to (1) "replacement of a well that failed due to an unexpected, calamitous event," or (2) "replacement of a well that has suffered a decline in production due to things such as reduction in pressure available or a change in the relative permeability of the formation." There is nothing in the discussion on these pages to suggest this is an exclusive list of the causes of well failure that might require a replacement well or that calamities necessarily include casing ruptures and fishes in the hole that are not due to unusual events.

Chevron also points out that Bertholf agreed that these losses were calamities. While Bertholf did testify that he would consider "parted tubing and fishes in the hole" as "calamities," this essentially was a legal opinion that was not binding on the Board.

Chevron next challenges what it claims is Kern's "phantom requirement that [Chevron] be completely free of fault in the episodes that caused well failures." But Kern asserts no such thing. Instead, it argues that "regardless of whether the event is [] sudden or beyond the taxpayer's control," *T.L. Enterprises* "requires a showing that the precipitating event was 'unforeseeable' and 'out of the ordinary.'"

Finally, Chevron claims well losses are not foreseeable merely because it anticipates and plans for them, since no one knows precisely which wells will fail or how. It argues that despite the forecasted losses, each well lost is an unexpected calamity. But the fact that Chevron does not know which wells will fail does not mean that the failures are out-of-the-ordinary or unusual. Instead, that Chevron plans for the well failures shows that such failures are not unusual.

43.

In sum, we agree with the Board and trial court that wells were not lost due to calamity or misfortune within the meaning of section 70, subdivision (c), and therefore such wells are subject to supplemental assessment.

## DISPOSITION

That portion of the judgment ordering the Board to set aside its April 5, 2010 decision in the administrative proceedings entitled *In the Assessment Appeals of Chevron USA, Inc.* and remanding the matter to the Board for reconsideration of the appropriateness of the supplemental assessments is reversed. The superior court is directed to enter judgment for the County of Kern. In all other respects, the judgment is affirmed. The County of Kern is awarded its costs on appeal.


_____
Gomes, J.

WE CONCUR:


_____
Hill, P.J.


_____
Cornell, J.

44.